The PEOPLE of the State of Colorado, Petitioner–Appellee,

In the Interest of Joyce A. STRODTMAN, Respondent–Appellant.

No. 11CA1284.

Colorado Court of Appeals, Div. I.

Oct. 27, 2011.

**126**

David W. Broadwell, City Attorney, Michael Stafford, Assistant City Attorney, Denver, Colorado, for Petitioner–Appellee.

Law Offices of Terry Tomsick, Terry Tomsick, Denver, Colorado, for Respondent–Appellant.

Opinion by Judge TAUBMAN.

Respondent, Joyce A. Strodtman, appeals the magistrate's order authorizing the Denver Health Medical Center (DHMC), upon the People's petition, to forcibly administer her antipsychotic medications. We affirm.

## I. Background

Strodtman was detained at DHMC in April 2011 and determined to be gravely disabled upon evaluation. Thereafter, the People filed a petition for certification of short-term treatment pursuant to section 27–65–107, C.R.S.2011. They also filed a separate petition requesting an order authorizing DHMC to forcibly administer to Strodtman several antipsychotic medications.

At a May 9 hearing before a probate magistrate, Strodtman, represented by counsel, stipulated as to the short-term certification but objected to the forcible medication order. The hearing proceeded on that matter. At the conclusion of the hearing, the magistrate granted the petition and authorized DHMC to forcibly administer the proposed medications to Strodtman.

Immediately following the hearing, and before a May 13 written order issued, DHMC staff forcibly administered to Strodtman the listed medications. Strodtman then moved the magistrate for an automatic stay pursuant to C.R.C.P. 62(a). The magistrate denied her motion. This appeal followed.

Strodtman has since also entered into a consent order with the People, signed by the magistrate, extending her short-term certification and the DHMC's forcible medication administration authority through October 29, 2011.

## II. Subject Matter Jurisdiction

Strodtman contends for the first time on appeal that the magistrate's order is void for lack of subject matter jurisdiction. We disagree.

### A. Standard of Review

■ "A trial court's determination regarding subject matter jurisdiction is a question of law and is therefore subject to de novo review." *Lee v. Banner Health*, 214 P.3d 589, 594 (Colo.App.2009).

### B. Analysis

■ Arguments not raised in the trial court are generally deemed waived. *Moody v. People*, 159 P.3d 611, 614 (Colo.2007). However, because a challenge to a court's subject matter jurisdiction may be raised for the first time on appeal, we reach Strodtman's jurisdictional argument.[1] *Herr v. People*, 198 P.3d 108, 111 (Colo.2008).

A court must have subject matter jurisdiction to hear and decide a case. *Currier v. Sutherland*, 218 P.3d 709, 714 (Colo.2009). C.R.M. 6(e) delineates the jurisdiction of magistrates in mental health cases by authorizing them, with the consent of necessary parties, to "[h]ear and rule upon all matters

---

1. Although Strodtman also argues on appeal that the applicable statutes unconstitutionally delegated to the magistrate the authority to rule on the forcible medication issue, we conclude that Strodtman waived this argument by agreeing to the hearing before the magistrate. *See Moody*, 159 P.3d at 614.

filed pursuant to C.R.S. Title 25 and Title 27." C.R.M. 6(e)(2)(B). Thus, whether the magistrate possessed subject matter jurisdiction to authorize the administration of antipsychotic medication turns on the scope of Title 27.

In the seminal Colorado case on forcible medication administration, *People v. Medina,* 705 P.2d 961, 971 (Colo.1985), the Colorado Supreme Court recognized Title 27's "statutory grant of jurisdiction and venue" to courts to issue such orders. Before deciding what standards courts should apply in such hearings, the court stated:

> [I]n the event a patient refuses to accept medication the court which originally ordered the patient's certification shall have "jurisdiction and venue to accept a petition by a treating physician and to enter an order requiring that the [patient] accept such treatment, or, in the alternative, that the medication be forcibly administered to him."

*Id.* (quoting Ch. 116, sec. 3, § 27-10-111(4.5), 1982 Colo. Sess. Laws 447); *see also Hopkins v. People,* 772 P.2d 624, 625 (Colo.App. 1988) (affirming a court's jurisdiction to order forcible administration of antipsychotic medications).

■ Since *Medina* was decided, former section 27-10-111(4.5) was amended and repealed. Ch. 1043, sec. 1, 1996 Colo. Sess. Laws 1043-44 (adding authority relating to criminal proceedings); Ch. 188, sec. 1, 2010 Colo. Sess. Laws 675 (repealing art. 10). However, the General Assembly added sections substantially similar to those of former article 10 in article 65. Section 27-65-111(5)(a), C.R.S.2011, currently provides in relevant part:

> In the event that a respondent … refuses to accept medication, the court having jurisdiction of the action pursuant to subsection (4) of this section … shall have jurisdiction and venue to accept a petition by a treating physician and to enter an order requiring that the respondent … accept such treatment or, in the alternative, that the medication be forcibly administered to him or her.

The court in which a short-term certification was filed under section 27-65-107, has original and continuing jurisdiction under section 27-65-111(4), C.R.S.2011.

We conclude this section is substantially similar to that of repealed section 27-10-111(4.5), and thus the *Medina* court's analysis applies. This section constitutes a "statutory grant of jurisdiction and venue" in matters concerning forcible administration of medication. Under C.R.M. 6(e)(2)(B), magistrates also possess jurisdiction over these matters. Therefore, the magistrate did not lack jurisdiction to hear and decide Strodtman's case.

## III. Full and Fair Adversary Hearing

On the merits, Strodtman contends the magistrate violated her due process rights because he failed to conduct a full and fair adversary hearing. Specifically, she alleges that five hearing errors undermined the fairness of the hearing: the magistrate (1) compelled Strodtman to testify as the People's first witness; (2) admitted Dr. Erin O'Flaherty as "an expert in medicine"; (3) admitted hearsay through the testimony of the People's medical experts; (4) improperly congratulated the People's counsel for his expertise; and (5) improperly commented on Strodtman's mental illness in his final ruling. We reject these contentions.

### A. Standard of Review

Strodtman urges us to evaluate her claim that the magistrate conducted an unfair hearing under the criminal standard of *Crider v. People,* 186 P.3d 39 (Colo.2008). Under *Crider,* before disregarding as harmless any errors of a "constitutional dimension," a reviewing court must be convinced beyond a reasonable doubt of the lack of an error's prejudicial impact by evaluating it in the totality of the circumstances. 186 P.3d at 42-43.

We decline to apply this criminal standard to a civil commitment hearing because "civil commitment proceedings in Colorado are not criminal in nature." *People ex rel. Ofengand,* 183 P.3d 688, 692 (Colo.App.2008) (citing *Gilford v. People,* 2 P.3d 120, 124-25 (Colo.2000)). Colorado's mental health statutes afford due process, and so our inquiry

turns on whether the magistrate deviated from the statutes. *People in Interest of Clinton,* 762 P.2d 1381, 1390 (Colo.1988). Thus, we review alleged hearing errors under the due process standards used in *Medina,* 705 P.2d 961, and the civil commitment statutes. The standard of review applicable to this inquiry depends on the nature of the alleged error. *Compare Golob v. People,* 180 P.3d 1006, 1011 (Colo.2008) (admission of expert testimony reviewed for abuse of discretion), *with Cinemark USA, Inc. v. Seest,* 190 P.3d 793, 795 (Colo.App.2008) (interpretations of law reviewed de novo). Then, with respect to any deviation, we apply the two-part *Gilford* test, evaluating (1) the gravity of any deviation from a statutory or due process requirement and (2) the prejudice to the patient, which we discuss further below. *Gilford,* 2 P.3d at 126.

## B. Analysis

■ "[E]very human being of adult years and sound mind has a right to determine what shall be done with his own body." *Goedecke v. State,* 198 Colo. 407, 411, 603 P.2d 123, 125 (1979) (quoting *Schloendorff v. Society of New York Hospital,* 211 N.Y. 125, 105 N.E. 92, 93 (1914)). Proceedings such as Strodtman's curtail this liberty and therefore must satisfy constitutional standards of due process. When the administration of involuntary antipsychotic medication is at issue, the United States Supreme Court has held that due process requires notice, the right to be present at an adversary hearing, and the right to present and cross-examine witnesses. *Washington v. Harper,* 494 U.S. 210, 235, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990).

■ In Colorado, a court must conduct a "full and fair adversary hearing" on the matter with certain "procedural protections." *Medina,* 705 P.2d at 963, 972. These are the same statutorily defined procedures that apply to civil commitment and treatment hearings. *Id.* at 972–74; *Ofengand,* 183 P.3d at 692. The person seeking to administer treatment bears the burden of proof, by clear and convincing evidence. *Medina,* 705 P.2d at 972–73. A patient has the right to counsel, to cross-examine adverse witnesses, and to present evidence to support his or her refus-

al. *Id.* "If the patient is not present ... or elects not to testify, ... the trial judge [need not] talk with the patient and observe the patient's physical and mental condition." *Id.* at 973.

In addition to the enumerated safeguards of *Medina,* the Colorado Supreme Court has addressed what procedural rights are "essential" to civil commitment proceedings. *Gilford,* 2 P.3d at 125; *Clinton,* 762 P.2d at 1390. Generally, treatment hearings under the statute "shall be conducted in the same manner as other civil proceedings before the court." § 27–65–111(1), C.R.S.2011; *see also People in Interest of Hoylman,* 865 P.2d 918, 919 (Colo.App.1993) (patient may have jury or bench trial).

■ Not all statutory deviations or procedural errors in treatment hearings violate a patient's due process rights, however. *Clinton,* 762 P.2d at 1391 (delays in appointment of counsel not sufficiently grave); *cf. Gilford,* 2 P.3d at 126 (failure to proceed without delivery of petition to patient constituted reversible error). We review alleged procedural violations for their impact on the fairness of the hearing "by (1) evaluating the gravity of the deviation from statutory provisions, including a consideration of due process concerns, and (2) determining any prejudice to the respondent caused by the deviation." *Gilford,* 2 P.3d at 126 (quoting *People in Interest of Lynch,* 783 P.2d 848, 852 (Colo.1989)); *accord Ofengand,* 183 P.3d at 693.

### 1. Strodtman's Testimony

Strodtman argues the magistrate erred when he permitted the People to call her, against her will, as their first witness. Although Strodtman stated at the hearing that she was not asserting her Fifth Amendment privilege, she nevertheless objected to being called to testify as the People's first witness because it constituted impermissible burden shifting. We perceive no error.

Relying on the statute and *People v. Taylor,* 618 P.2d 1127 (Colo.1980), the magistrate found "there is nothing that prevents the [People] from calling [Strodtman]" and "[i]t appears that she may be called on to establish [the People's] prima facie case." We

review de novo his interpretations of law. *See, e.g., Cinemark USA, Inc.,* 190 P.3d at 795.

■ Under *Taylor,* the Fifth Amendment privilege against self-incrimination does not extend to patients in Colorado's civil commitment proceedings. 618 P.2d at 1140. Based on its broad language and rationale distinguishing civil commitment proceedings from criminal proceedings, we are not persuaded that the holding applies solely to civil commitment proceedings. Forcible administration of medication occurs during the civil commitment process. Accordingly, *Medina* affords the same safeguards for medication hearings as is afforded to respondents in civil commitment hearings. *Ofengand,* 183 P.3d at 692. *Taylor* thus applies here.

Nor does *Medina* affect the application of *Taylor* to forcible medication hearings. Although *Medina* does not require a patient to testify to be afforded due process, it also does not preclude a court from having the patient testify. 705 P.2d at 973 n.10. Under *Taylor,* Strodtman had no privilege against self-incrimination.

Without a privilege against self-incrimination, Strodtman's argument that her testifying for the People impermissibly shifted the burden of proof necessarily fails. Parties may call adverse witnesses. *See Burr v. Green Bros. Sheet Metal, Inc.,* 159 Colo. 25, 28, 409 P.2d 511, 513 (1966). Strodtman does not cite, and we have not found, any authority precluding adverse witnesses from being called *first.*

The evidence also shows the magistrate properly placed on the People the burden of proof throughout the hearing, despite the order of witnesses. Therefore, the magistrate did not err by permitting the People to call Strodtman as their first witness.

### 2. "Expert of Medicine"

Strodtman also maintains that her due process rights were violated because the magistrate improperly certified Dr. O'Flaherty, a first-year resident, as an "expert of medicine." We disagree.

■ A district court has broad discretion to determine the admissibility of expert testimony. *Golob,* 180 P.3d at 1011. We review a court's determination for abuse of discretion and, accordingly, will not overturn it unless "manifestly erroneous." *Id.*

We note at the outset that resident physicians have been qualified in specialized fields of medicine. *See, e.g., People in Interest of Martinez,* 841 P.2d 383, 384 (Colo.App.1992) (finding court did not abuse its discretion in qualifying a resident as an expert in the field of psychiatry). Here, the People sought to qualify Dr. O'Flaherty as an "expert in medicine" because she had not yet been board certified in psychiatry, and so we review the magistrate's decision for abuse of discretion.

In Colorado, medical experts are generally qualified to testify in the field of one or more specialties. *See, e.g., Blankenship v. Iowa Nat'l Mut. Ins. Co.,* 41 Colo.App. 430, 431, 588 P.2d 888, 889 (1978) (expert in the field of orthopedic surgery). Strodtman contends qualification in the general field of medicine violates CRE 702, and thus her due process rights. As an issue of first impression, we must determine whether CRE 702 permits a physician to testify without a specialty, as "an expert in medicine."

Case law from other jurisdictions indicates the generally prevailing rule is that "otherwise qualified physicians or surgeons are not incompetent to testify as experts merely or necessarily because they are not specialists in the particular branch of their profession involved in the case." 31A Am.Jur.2d *Expert and Opinion Evidence* § 207 (2011); *see De-Burkarte v. Louvar,* 393 N.W.2d 131, 138 (Iowa 1986) ("[a] physician need not be a specialist in a particular field of medicine to give an expert opinion"); *Worthy v. McNair,* 37 So.3d 609, 616 (Miss.2010) ("[I]t is the scope of the witness' knowledge and not the artificial classification by title that should govern the threshold question of admissibility.").

■ Supporting the adoption of this rule in Colorado is the broad scope of CRE 702 governing the admissibility of expert testimony. Witnesses may be qualified as experts by virtue of their "knowledge, skill, experience, training, or education." CRE 702. Under this liberal rule, a court may admit

expert testimony if the witness can offer "appreciable" assistance on a subject beyond the understanding of an "untrained layman." *People v. Williams*, 790 P.2d 796, 798 (Colo. 1990). Thus, in a particular case, the certification of a resident physician as a general medical expert may be consistent with this rule.

Additionally, an important safeguard offsets any concerns Strodtman may have regarding this liberal construction of CRE 702. If an expert is qualified, the decision-maker determines the weight and the credibility of his or her testimony. *See Estate of Ford v. Eicher*, 220 P.3d 939, 944 (Colo.App.2008), *aff'd*, 250 P.3d 262 (Colo.2011).

■ Therefore, we conclude that a physician may be qualified as an "expert in medicine" so long as his or her knowledge, skill, experience, training, or education supports the qualification, and he or she is capable of providing specialized knowledge that will assist the decision-maker in determining the issues.

■ Here, at the time of the hearing, Dr. O'Flaherty had received a medical degree after numerous years of schooling and a physician's training license after passing her certification exams. She was working as a first-year psychiatry resident at the University of Colorado–Denver, including during her rotation at DHMC where she treated Strodtman. Questions regarding her background reasonably evinced her specialized knowledge in treating psychiatric patients. The People sought to certify, and the magistrate qualified, Dr. O'Flaherty as an expert in medicine. Based on her specialized education and training on the subject of medicine, we discern no abuse of discretion in her qualification as an expert in medicine under the circumstances presented here.

### 3. Hearsay

Strodtman next contends the magistrate erred in permitting the People's medical experts to provide hearsay testimony. Because the challenged testimony constituted the basis for the opinion of these properly qualified experts, we disagree.

■ Under CRE 703, experts may testify as to inadmissible facts and data, including hearsay, if that evidence formed the basis of the expert's opinion and is of the type reasonably relied on by others in the field. *People in Interest of M.M.*, 215 P.3d 1237, 1250 (Colo.App.2009). Again, "the standard of review pertaining to the admissibility of expert testimony is highly deferential." *People v. Ramirez*, 155 P.3d 371, 380 (Colo.2007) (decision will be overturned only if manifestly erroneous).

■ Here, Strodtman argues that testimony by the People's medical experts regarding information learned from her caseworker regarding her history of "progressive deterioration" constituted hearsay and was thus improperly admitted. However, both Dr. O'Flaherty and Dr. Jonathan Boyer, an attending psychiatrist at DHMC, testified that Strodtman's caseworker's information helped them understand her history, from which they diagnosed her condition and need for treatment. Dr. O'Flaherty also testified that information gauged from conversations with case managers and outside treatment providers is reasonably relied on in the field because of their daily interactions with the patients and "their [important] collateral input . . . in [the doctor's] discharge planning."

Therefore, under CRE 703, the magistrate did not abuse his discretion in admitting the doctors' testimony to this effect, and our inquiry ends here. *See Martinez*, 841 P.2d at 384 (hospital records, information from resident, and admission data from other psychiatrists served as customary bases for opinion); *People v. Pflugbeil*, 834 P.2d 843, 847 (Colo.App.1992) (testimony based on statements of other health professionals admissible).

### 4. Congratulatory Comment by Magistrate

Next, Strodtman argues an interchange between the magistrate and the People's counsel evinced favoritism by the magistrate and therefore a lack of due process at the hearing. Specifically, after the People's counsel informed the magistrate that he taught classes on civil commitment, the magistrate responded that he "appreciate[d] [his]

expertise." We perceive no bias in this interchange.

■ To warrant reversal based on a judge's comments, questions, and demeanor, the record must clearly establish bias. *People v. Rodriguez*, 209 P.3d 1151, 1162 (Colo. App.2008), *aff'd*, 238 P.3d 1283 (Colo.2010). "The test is whether the trial judge's conduct so departed from the required impartiality as to deny the [party] a fair trial." *Id.*

Generally, casual remarks made while passing on objections to testimony do not so depart unless they reflect adversely upon the parties or the ultimate issue. *Id.* (citing *People v. Corbett*, 199 Colo. 490, 496, 611 P.2d 965, 969 (1980)).

■ Accordingly, because the magistrate's casual comment made while passing on the objection to testimony in no way reflected upon Strodtman or her treatment, we conclude the magistrate did not so depart from the required impartiality in making it.

### 5. Magistrate's Final Comments

Similarly, Strodtman contends the magistrate's final comments regarding his personal experience with therapy and the need to "surrender" to treatment demonstrated reversible bias. Again, we disagree.

Although the magistrate's comments regarding his personal experience were inappropriate, *see People v. Coria*, 937 P.2d 386, 391 (Colo.1997) (judge "must exercise restraint over his or her conduct and statements to maintain an impartial forum"), we conclude they did not ultimately prejudice Strodtman so as to depart from the required impartiality. *Corbett*, 199 Colo. at 496, 611 P.2d at 969. The magistrate's written order demonstrated that he properly decided this case based on the *Medina* elements, and not on his personal views about therapy.

### IV. Compliance with *People v. Medina* Elements

Next, Strodtman argues the magistrate erred in finding the People had proved all four elements required by *Medina* by clear and convincing evidence. We discern sufficient support for the magistrate's findings in the record and therefore reject this argument.

### A. Standard of Review

Because each element of *Medina* implicates a mixed question of law and fact, we review the magistrate's conclusions of law de novo and we defer to the trial court's findings of fact if sufficient evidence in the record supports them. *See, e.g., People v. Bonilla—Barraza*, 209 P.3d 1090, 1094 (Colo.2009).

### B. Analysis

■ To obtain the authority to involuntarily administer antipsychotic medication without violating a patient's due process rights, a health care provider must prove by clear and convincing evidence the four elements under *Medina:*

(1) that the patient is incompetent to effectively participate in the treatment decision;

(2) that treatment by antipsychotic medication is necessary to prevent a significant and likely long-term deterioration in the patient's mental condition or to prevent the likelihood of the patient's causing serious harm to himself or others in the institution;

(3) that a less intrusive treatment alternative is not available; and

(4) that the patient's need for treatment by antipsychotic medication is sufficiently compelling to override any bona fide and legitimate interest of the patient in refusing treatment.

*Medina*, 705 P.2d at 973.

The State's burden of proof was to persuade by "clear and convincing evidence" that the conditions for involuntary medical treatment were met. *Taylor*, 618 P.2d at 1135.

### 1. Incompetence to Effectively Participate in Treatment Decision

Strodtman first argues the magistrate erred in finding she was incompetent to participate effectively in her own treatment decision because, based on her testimony and the lack of evidence by the People, the People

failed to meet their burden by clear and convincing evidence.

Concerning this element, the court must be satisfied that "the patient's mental illness has so impaired his judgment as to render him 'incapable of participating in decisions affecting his health.'" *Medina*, 705 P.2d at 973 (quoting *Goedecke*, 198 Colo. at 411, 603 P.2d at 125).

Strodtman contends that her testimony on her preferences and concerns about side effects clearly evinced her competency to participate in treatment decisions. Therefore, she argues, the magistrate should have held the injections in abeyance until she became unwilling or unable to participate.

*Medina* does not so clearly require what Strodtman suggests, however. A court must make a finding of "incompetence to effectively participate in treatment decisions," not merely one of whether the patient may articulate his or her preferences. To participate effectively contemplates action in addition to words.

■ Accordingly, the magistrate found:

10. ... [T]here is conflicting testimony as to whether [Strodtman] is competent to effectively participate in treatment decisions to [the] extent of refusing injections.

. . . .

12. The treatment staff at Denver Health Medical Center's position is that [Strodtman]'s mental illness impedes her ability to effectively participate in treatment decisions and that given [Strodtman]'s history, there are legitimate concerns regarding her compliance with taking prescribed medications.

13. [Strodtman] is not competent to *effectively* participate in treatment decisions. The key word is effectively. [She] has not surrendered to or embraced her need for treatment. Her history of non-compliance with taking medications orally is concerning. It is clear from both doctors['] testimony that it is imperative that [Strodtman] be medication compliant in order to avoid [her] being rehospitalized time and again after decompensating from medication non-compliance.

The evidence in the record supports these findings. Dr. O'Flaherty and Dr. Boyer testified concerning Strodtman's history of noncompliance with medication. Dr. Boyer testified that Strodtman believed she had Alzheimer's disease, not schizophrenia, and therefore, that she would be less likely to take her medications outside the hospital. Finally, the magistrate was entitled to make credibility determinations of Strodtman and the doctors. We conclude this evidence sufficiently supports the magistrate's finding on the first *Medina* element and therefore reject Strodtman's contention.

### 2. Necessary to Prevent Deterioration or Likelihood of Harm

Strodtman also maintains the People failed to meet their burden on the second *Medina* element. Again, we disagree.

The determination of "whether the proposed treatment is necessary either to prevent a significant and likely long-term deterioration in the patient's mental condition or to prevent the likelihood of the patient's causing serious harm to himself or others" requires the court to consider one of two alternative factors: either (1) the patient's "actual need for medication," based on "the nature and gravity" of his or her illness, the efficacy of the proposed treatment, and "whether the failure to medicate will be more harmful ... than any risks posed by the medication"; or (2) the risk of physical harm to the patient and others without the proposed treatment. *Medina*, 705 P.2d at 973.

■ Here, the magistrate considered Strodtman's actual need for injectable antipsychotic medications and found, based on the testimony of the People's medical experts, the following:

> When not taking her prescribed medications, respondent decompensates quickly and her ability to live independently evaporates.... [I]t is imperative to keep an individual on the antipsychotic medications, likening the treatment of mental illness to the treatment of a serious cardiac condition, wherein if there are cycles of non-treatment, the condition worsens.

His finding was supported by evidence that Strodtman "was functioning poorly upon ad-

mission to the hospital" but improved dramatically with administration of the at-issue medications. He also found "there was no testimony from [Strodtman] that rebutted this testimony."

Strodtman contends that the finding was in error because no evidence was presented that her failure to take medication in the future would cause significant and long-term deterioration. We reject this argument. Both of the People's medical experts testified that Strodtman was not taking medication when she was hospitalized, that the medication effectively treated the symptoms that caused her to be hospitalized, and that, without this medication, she would experience significant, long-term deterioration. Accordingly, the magistrate found this element established by clear and convincing evidence based on sufficient evidence in the record, and we refuse to overturn his finding.

### 3. No Less Intrusive Alternative

Strodtman next contends the People entirely failed to satisfy the third element of *Medina*. However, we conclude the record supports the magistrate's finding that the People met their burden.

█ In support of her contention, Strodtman argues that her voluntarily taking medication orally at the time of the hearing clearly showed a treatment less intrusive than forcible injection was available. Under *Medina*, a "less intrusive alternative" constitutes an available treatment that has less harmful side effects and is at least as effective at alleviating a patient's condition as the proposed treatment. *Medina*, 705 P.2d at 974. Strodtman's argument fails to account for the People's concern that, because Strodtman lacked the capacity to consistently self-medicate, oral medication taken voluntarily was not an available *effective* treatment.

The People's experts testified that a lapse in taking the medication would worsen Strodtman's condition. Based on her history, they also concluded a treatment plan involving only voluntary oral medications carried a high risk of relapse, and therefore a high risk of worsening Strodtman's condition. Thus, they believed an oral treatment plan would be less effective than injections. With

respect to side effects, the magistrate also considered Dr. Boyer's testimony that the injectable version of one of the at-issue medications, Riperdal, "has a lower side effect profile than the oral form."

We conclude this evidence sufficiently support's the magistrate's finding that oral treatment did not constitute a "viable" less intrusive alternative to injections.

### 4. Compelling Need for Treatment

Finally, Strodtman argues the People failed to show how her "need for treatment [was] sufficiently compelling to override any legitimate interest of the patient in refusing treatment." *Medina*, 705 P.2d at 974. We reject this argument.

Here, Strodtman did not refuse to take antipsychotic medication. Rather, although she was willing to take oral medication, she was "not willing to take injections."

The magistrate therefore compared the risks and benefits of Strodtman's taking oral versus injectable medication. *See Medina*, 705 P.2d at 974 (court must decide whether "patient's personal preference must yield to the legitimate interests of the state in preserving the life and health of the patient placed in its charge"). He found the long-lasting form of Risperdal, with fewer side effects than other forms, was available only via injection. We also conclude his earlier finding "that it is imperative that [Strodtman] be medication compliant in order to avoid ... being hospitalized time and again after decompensating from medication non-compliance" was inherently tied to his determination on this element.

Although the magistrate found Strodtman's objections to injections "valid," he ultimately found the People's interest in being granted forcible medication administration authority more persuasive. We again find the magistrate's finding supported by sufficient evidence in the record and hereby affirm it.

### V. Automatic Stay

Finally, as a matter of first impression in Colorado, Strodtman argues the magistrate

erred by denying her post-hearing motion seeking an order automatically staying forcible administration pursuant to C.R.C.P. 62. We disagree.

## A. Standard of Review

■■■ "Our interpretation of the rules of civil procedure involves questions of law, which we review de novo." *Isis Litig., L.L.C. v. Svensk Filmindustri*, 170 P.3d 742, 744 (Colo.App.2007).

## B. Analysis

Although Strodtman had already been administered medication at the time she appealed the magistrate's decision not to stay his order, we reach the merits of this issue because we conclude it is an issue capable of repetition, yet evading review, and therefore not moot. *Gilford*, 2 P.3d at 124 (mootness exception applies in civil commitment case); *Ofengand*, 183 P.3d at 691 (mootness exception applies to forcible medication hearing).

C.R.C.P. 62(a) grants parties an automatic fifteen-day stay of judgment for certain civil orders. The rule provides:

> Except as stated herein, no execution shall issue upon a judgment nor shall proceedings be taken for its enforcement until the expiration of fifteen days after its entry; provided that an interlocutory or final judgment in an action for an injunction or in a receivership action shall not be stayed during the period after its entry and until an appeal is taken or during the pendency of an appeal. Unless otherwise ordered by the court, the provisions of section (c) of this Rule govern the suspending, modifying, restoring, or granting of an injunction during the pendency of an appeal.

Thus, automatic stays are applicable only to final judgments, not to injunctions or temporary or interlocutory orders. C.R.C.P. 62(a) (exempts interlocutory and final orders for injunctions); *In re Marriage of Adams*, 778

P.2d 294, 295 (Colo.App.1989) (temporary order awarding child custody not subject to Rule 62). C.R.C.P. 54(a) defines "judgment" for the purposes of the rules as "a decree and order to or from which an appeal lies."

Strodtman contends an order granting forcible medication administration authority constitutes a final judgment to which Rule 62(a) applies. She does not cite, and we have not found, any Colorado case on this issue. Instead, she relies on the broad language of the rules, a recent decision by the Vermont Supreme Court, *In re L.A.*, 183 Vt. 168, 945 A.2d 356 (2008), and underlying policy.[2]

In *L.A.*, the Vermont Supreme Court held that an order granting the state's petition to forcibly administer psychiatric medication was automatically stayed pending appeal. *Id.* at 361; *see* C.R.C.P. 62(d) (permitting stays pending appeal, subject to same exceptions as C.R.C.P. 62(a)). Although Strodtman urges us to follow *L.A.*, we conclude it is distinguishable.

Vermont Family Court Rule 12(a) constitutes a modified version of C.R.C.P. 62 providing for automatic stay of execution or enforcement of judgments. In the rule, the Vermont legislature expressly exempted actions under enumerated statutory provisions (Vt.Stat.Ann.tit. 18, §§ 7611–7623), including civil commitment and treatment decisions; however, it failed to list the provision governing involuntary medication orders. 945 A.2d at 360. The Vermont court thus interpreted the plain language of the rule as evincing the legislature's intent to apply the rule to such orders. *Id.* at 361.

In contrast, C.R.C.P. 62 contains no indication of whether it applies to civil commitment proceedings. The Colorado rule broadly applies to "judgments," and broadly exempts "injunctions." *L.A.* therefore has limited applicability.

---

2. We reject Strodtman's reliance on *Sell v. United States*, 539 U.S. 166, 169, 123 S.Ct. 2174, 156 L.Ed.2d 197 (2003). There, the Supreme Court held that the government may constitutionally administer antipsychotic drugs to a mentally ill criminal defendant to render that defendant competent to stand trial. *Sell* is distinguishable on two grounds. First, it is a criminal case, which presents different considerations from those present here. Second, the *Sell* court held that the forcible medication order there was a pretrial order reviewable under the "collateral order" doctrine, which ordinarily does not apply in Colorado. *See Paul v. People*, 105 P.3d 628, 631 (Colo.2005).

Nor have we found guidance from any other state concerning the application of Rule 62 to forcible medication actions, or more generally, civil commitment actions. *Cf., e.g., Mitchell v. State,* 911 So.2d 1211, 1214–15 (Fla.2005) (judgment on civil commitment of sex offender automatically stayed pending appeal by state, but applicable rule distinguishable).

In response to Strodtman's argument that Rule 62 applies to forcible medication orders, the People argue that Colorado case law limits Rule 62 to judgments for money or property. They rely on *In re Marriage of Adams,* 778 P.2d 294, in which a division of this court held that Rule 62 did not apply to a temporary order for child custody. We conclude this case is also inapposite.

Although the dissolution and child custody proceedings at issue in *Adams* were in personam, we are not persuaded that its holding stands for the broad proposition that *no* in personam proceeding may be automatically stayed under Rule 62. Rather, the *Adams* division rested its decision on the specific nature of the child custody order: temporary, not final and appealable. 778 P.2d at 295 (citing *In re Marriage of Henne,* 620 P.2d 62, 64 (Colo.App.1980) (temporary custody order is not a final judgment)). In contrast, Strodtman's forcible medication order was appealable and final. In addition, the *Adams* division did not hold that Rule 62 is limited to judgments for money or property. *Adams,* in its narrow application of the automatic stay rule, does not dictate the ultimate issue underlying this claim: whether the order constitutes a judgment to which Rule 62(a) applies.

Colorado case law is scant on this issue, however. Therefore, we must interpret Rule 62(a) in the first instance, affording its language plain and ordinary meaning, and reading it as a whole and in the context of the Rules of Civil Procedure. *See, e.g., Guido v. Indus. Claim Appeals Office,* 100 P.3d 575, 577 (Colo.App.2004).

On its face, Rule 62(a) dictates that two categories of actions must be automatically stayed: (1) executable judgments and (2) proceedings to enforce judgments. Additionally, it exempts from its application two types of actions: (1) injunctions and (2) receivership actions. The applicability of Rule 62(a) turns on whether an action for forcible medication authority falls into any of these four categories.

Initially, we reject categorizing this action as either an injunction or a receivership action because it was not brought pursuant to C.R.C.P. 65 or 66, respectively.

However, although the magistrate's order constitutes a "judgment" under C.R.C.P. 54(a)'s broad definition as "a decree and order to or from which an appeal lies," we also conclude it is not a judgment that may be executed or a proceeding to enforce a judgment.

Execution of judgments often refers to the "judicial enforcement of a money judgment, usually by seizing and selling the judgment debtor's property." *Black's Law Dictionary* 650 (9th ed.2009); *see also, e.g., Muck v. Arapahoe County Dist. Court,* 814 P.2d 869, 872 (Colo.1991) ("Colorado has a long history of requiring the filing of a bond as a condition for an order *staying the execution of judgment.*" (emphasis added)). The context of the Rules of Civil Procedure as a whole persuades us to apply this definition to C.R.C.P. 62(a). For example, C.R.C.P. 69 provides that courts shall enforce final money judgments by "writ of execution," except when they shall issue writs of garnishment under C.R.C.P. 103. *See also* C.R.C.P. 102 (sheriff shall execute writ of attachment, as well). The other subsections of Rule 62 also illustrate the distinction between money judgments and other types of judgments. *Donovan v. Fall River Foundry Co.,* 696 F.2d 524, 526 (7th Cir. 1982) (permitting automatic stays of money judgments with a supersedeas bond, but requiring the discretionary grant of stay for other judgments). Because it does not concern money, a forcible medication administration order thus cannot be enforced by writ of execution.

Finally, we conclude an order granting forcible medication administration authority is self-executing and therefore, by definition, additional enforcement proceedings are unnecessary.

Therefore, we conclude that a forcible medication administration order is not the type of action contemplated in Rule 62(a). Accordingly, orders for forcible medication administration are not automatically stayed for fourteen days after entry.

This conclusion does not leave parties against whom such orders have been entered without a remedy, however. Rule 62(g) permits courts to stay judgments or "make any order appropriate to preserve the status quo" prior to their enforcement. We conclude that a discretionary stay of a forcible medication administration order adequately protects the interests of a patient seeking appeal. Further, it does so without defeating the order's very purpose of preventing patients from decompensating or harming themselves and others.

The order is affirmed.

Judge ROMÁN and Judge BOORAS concur.