24CA1507 Peo in Interest of SD 10-31-2024

COLORADO COURT OF APPEALS
_____

Court of Appeals No. 24CA1507
Jefferson County District Court No. 24MH385
Honorable Bryce David Allen, Judge
_____

The People of the State of Colorado,

Petitioner-Appellee,

In the Interest of S.D.,

Respondent-Appellant.
_____

ORDER AFFIRMED IN PART AND REVERSED IN PART

Division I
Opinion by JUDGE LIPINSKY
J. Jones and Sullivan, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced October 31, 2024
_____

Kym Sorrells, County Attorney, Jennifer Mullenbach, Deputy County Attorney, Katherine R. Carroll, Assistant County Attorney, Golden, Colorado, for Petitioner-Appellee

Tezak Law, P.C., Mary Tezak, Florence, Colorado, for Respondent-Appellant

¶ 1    Respondent, S.D., appeals a magistrate's order authorizing short-term care and treatment under section 27-65-109, C.R.S. 2024, and authorizing the involuntary administration of five antipsychotic, two antianxiety, and two side effect medications.

¶ 2    S.D. contends that the evidence is insufficient to support the order.  We agree that the evidence does not support the order authorizing the involuntary administration of fluphenazine, olanzapine, paliperidone, diazepam, and lorazepam.  Therefore, we reverse the portion of the order authorizing the involuntary administration of those five medications.  In all other respects, we reject S.D.'s arguments and affirm.

## I.    Background

¶ 3    Forty-eight-year-old S.D. resided with her parents.  Family members called authorities in Jefferson County asserting "concern for safety due to [S.D.'s] prominent delusions that her brother and [sister-in-law were] stealing from her" and reporting that S.D. was "hyperverbal and extremely irritable."

¶ 4    Police brought S.D. to the Jefferson County Center for Mental Health for an evaluation.  S.D. was placed on a mental health hold and admitted to Centennial Peaks Hospital on August 7, 2024.  Dr.

Michael Chamberlain, a psychiatrist at the hospital, was assigned as S.D.'s attending psychiatrist. He diagnosed her with schizophrenia.

¶ 5 On August 9, 2024, Dr. Chamberlain filed a notice of certification and certification for short-term treatment, in which he said that S.D. was gravely disabled. He sought authorization to involuntarily treat S.D. with several antipsychotic, mood stabilizing, antianxiety, and side effect medications. An assistant county attorney entered her appearance on behalf of the People of the State of Colorado, and the court appointed counsel for S.D. The court set a hearing on Dr. Chamberlain's notice for August 19, 2024.

¶ 6 Following the evidentiary hearing, at which both Dr. Chamberlain and S.D. testified, the magistrate entered a written order certifying S.D. for short-term care. The magistrate found by clear and convincing evidence that S.D. had a mental health disorder; was gravely disabled; and had been offered, but had refused, voluntary treatment. The magistrate also found that the People had established all four of the elements for the involuntary administration of medication set forth in *People v. Medina*, 705 P.2d

2

961, 973 (Colo. 1985), and, accordingly, ordered the administration of the requested medications to S.D. against her will.

## II.    Discussion

¶ 7    S.D. challenges the sufficiency of the evidence supporting the order.  In particular, she contends the evidence was insufficient to support the magistrate's findings that (1) she was gravely disabled and (2) the first and third *Medina* elements were met.  We address each contention in turn.

## A.    Standard of Review

¶ 8    When a party challenges the sufficiency of the evidence, we review the record as a whole and, viewing it in the light most favorable to the People, determine whether the evidence is sufficient to support the court's decision.  *People in Interest of Ramsey*, 2023 COA 95, ¶ 23, 412 P.3d 827, 1204.  We review de novo the court's conclusions of law and defer to the court's findings of fact, including the weight and credibility afforded to the witnesses, if supported by the record.  *People in Interest of Strodtman*, 293 P.3d 123, 131 (Colo. App. 2011); *People in Interest of C.A.K.*, 652 P.2d 603, 613 (Colo. 1982).  "The district court, as fact finder, 'has discretion to determine the credibility of the witnesses; the

3

sufficiency, probative effect, and weight of the evidence; and the inferences and conclusions to be drawn from it.'" *People in Interest of R.C.*, 2019 COA 99M, ¶ 7, 451 P.3d 1229, 1231 (quoting *People in Interest of S.M.A.M.A.*, 172 P.3d 958, 962 (Colo. App. 2007)).

### B.    Certification for Short-Term Treatment

¶ 9    Section 27-65-109(1)(a) provides, in pertinent part, that a person with a mental illness "may be certified for not more than three months for short-term treatment" if

> [t]he professional staff of the facility detaining the person on an emergency mental health hold has evaluated the person and has found the person has a mental health disorder and, as a result of the mental health disorder, is a danger to the person's self or others or is gravely disabled.

¶ 10    The person or facility seeking to detain another for mental health care and treatment has the burden of proving by clear and convincing evidence that the subject person "has a mental health disorder and, as a result of the mental health disorder, is a danger to [the person's] self or others or is gravely disabled." § 27-65-113(1), C.R.S. 2024.  Evidence is clear and convincing when it "persuades the trier of fact that the truth of the contention

4

is 'highly probable.'" *People v. Taylor*, 618 P.2d 1127, 1136 (Colo. 1980) (quoting *Page v. Clark*, 592 P.2d 792, 800 (Colo. 1979)).

¶ 11     S.D. challenges the magistrate's finding that she is gravely disabled.  As relevant here, "gravely disabled" means

> a condition in which a person, as a result of a mental health disorder, is incapable of making informed decisions about or providing for the person's essential needs without significant supervision and assistance from other people. As a result of being incapable of making these informed decisions, a person who is gravely disabled is at risk of . . . significant psychiatric deterioration . . . that could result in substantial bodily harm.

§ 27-65-102(17), C.R.S. 2024.  The supreme court has explained that a person is gravely disabled if the person is unable to take care of her basic personal needs, such as food, shelter, clothing, and medical care.  *Taylor*, 618 P.2d at 1134.

¶ 12     The magistrate found that S.D. is gravely disabled because she is unable to make "informed decisions about providing for her essential needs without significant supervision and assistance, which may lead to significant psychiatric deterioration."  The record supports these findings.

5

¶ 13    At the hearing, Dr. Chamberlain testified that S.D. is not capable of taking care of her essential needs without significant assistance. He said that S.D.'s psychosis is "severe," it had "been progressive over the past several months," and it had "jeopardized her housing" and "her relationship with everyone [who had tried] to support her." As an example of S.D.'s symptoms of psychosis, she expressed concern to Dr. Chamberlain that, like her family members, he was stealing patents she owned. Dr. Chamberlain described the concerns of S.D.'s family and said that family members "filed a protective order against her so she cannot return to her former place of living."

¶ 14    Despite S.D.'s assertion that the evidence was insufficient because Dr. Chamberlain "did not offer any testimony regarding her ability to take care of personal needs," the record shows that S.D. is unable to provide for her own basic personal needs, especially as they relate to her medical care. Dr. Chamberlain testified that S.D. does not believe she has schizophrenia and, although she is willing to take her antiseizure medications, she is unwilling to accept any "mental health treatment."

¶ 15    Dr. Chamberlain also testified it was his opinion that, without treatment, S.D.'s mental health "would continue to deteriorate." He explained that, because psychosis "is self-perpetuating, . . . the longer [S.D.] spends with this delusional content that's prominent, the more likely . . . [she] is to have an episode in the future and the more severe that episode will be." He also testified that, "in her case there's no signs that it will abate without medication, so [he] imagine[s] it would just be a more progressive deterioration." S.D. did not present any medical evidence to contradict Dr. Chamberlain's opinions.

¶ 16    "Mental health statutes must be strictly construed because of their curtailment of personal liberty." *People in Interest of Schmidt,* 720 P.2d 629, 630 (Colo. App. 1986); *see also People in Interest of Dveirin,* 755 P.2d 1207, 1209 (Colo. 1988) ("Because of the curtailment of personal liberty which results from certification of mental illness, strict adherence to the procedural requirements of the civil commitment statutes is required."). However, where, as here, the magistrate's findings are supported by the record, we must defer to them on review. *See Ramsey,* ¶ 38, 541 P.3d at 1206. Accordingly, viewed in the light most favorable to the People, we

conclude that sufficient evidence supports the magistrate's finding that S.D. is gravely disabled.

## C. Involuntary Administration of Medication

¶ 17 An order for involuntary administration of medications must be supported by clear and convincing evidence

> (1) that the patient is incompetent to effectively participate in the treatment decision; (2) that treatment by antipsychotic medication is necessary to prevent a significant and likely long-term deterioration in the patient's mental condition or to prevent the likelihood of the patient's causing serious harm to himself or others in the institution; (3) that a less intrusive treatment alternative is not available; and (4) that the patient's need for treatment by antipsychotic medication is sufficiently compelling to override any bona fide and legitimate interest of the patient in refusing treatment.

*Medina,* 705 P.2d at 973.

¶ 18 S.D. contends that the evidence presented at the hearing was insufficient to support the involuntary medication order. While she concedes that sufficient evidence established that the second and fourth *Medina* elements were satisfied, she asserts that insufficient evidence established the first and third elements. We consider each of these disputed elements in turn.

### 1. Incompetence to Effectively Participate

¶ 19    First, we address, and reject, S.D.'s contention that the evidence was insufficient to prove the first *Medina* element — that she is incompetent to effectively participate in the treatment decision.

¶ 20    At the hearing, the magistrate found, by clear and convincing evidence, that "[t]here is an ongoing cycle of psychosis"; S.D. is "currently not participating [in her treatment]"; and "although very articulate, she is incompetent at this time to effectively participate in her treatment decision." The record supports the magistrate's findings.

¶ 21    Dr. Chamberlain testified that he did not believe S.D. was capable of effectively assisting in her treatment. He explained that he attempted to discuss S.D.'s proposed treatment with her but that she was not "willing to participate in that conversation" and "hasn't really been perceptive to any sort of care [he is] able to provide." Dr. Chamberlain explained that S.D. "seems to think [he is] involved in this conspiracy" with her family to steal her patents.

¶ 22    In addition, he testified that, whenever he attempted to talk to S.D. about possible treatment medications, she "quickly

interrupt[ed] [him] and [told him] that she can't take them because she wants to work as a [certified nursing assistant (CNA)]." Dr. Chamberlain said he understood that S.D. had "not yet worked as a CNA" but noted that "none of [the requested] medications would limit her ability to do so." Moreover, he opined that, "considering the prevalence of the paranoia, [the requested medications] would almost certainly be necessary for her to be in that role."

¶ 23    We are not persuaded by S.D.'s suggestion that, because she was able to testify "at length" regarding the medications she had tried in the past — identifying them by name and stating their purpose — she is competent to effectively participate in the treatment decisions. The first *Medina* element does not simply ask whether a patient has the ability to "articulate his or her preferences" in regard to treatment. *Strodtman,* 293 P.3d at 132. Rather, it asks whether the patient is competent to *effectively* participate in the treatment decision. *Medina,* 705 P.2d at 973. "To participate effectively contemplates action in addition to words." *Strodtman,* 293 P.3d at 132.

¶ 24    Accordingly, we conclude that the record supports the magistrate's finding that S.D. is "incompetent to effectively

10

participate in the treatment decision." *Medina*, 705 P.2d at 973;

*People v. Pflugbeil*, 834 P.2d 843, 847 (Colo. App. 1992).

### 2. Less Intrusive Alternative

¶ 25 Next, we address S.D.'s contention that the evidence was insufficient to prove the third *Medina* element — that a less intrusive treatment alternative is not available. *Medina*, 705 P.2d at 973. S.D. asserts that Dr. Chamberlain requested numerous medications "with the intent of experimenting with them to determine which is the most effective" and that a less intrusive treatment alternative would require Dr. Chamberlain to specify which medications he believes should be prescribed. We agree with S.D., in part.

¶ 26 The third *Medina* element "encompasses not only the gravity of any harmful effects from the proposed treatment but also the existence, feasibility, and efficacy of alternative methods of treating the patient's condition or of alleviating the danger created by that condition." *Id.* at 974. A "'less intrusive alternative' constitutes an available treatment that has less harmful side effects and is at least as effective at alleviating a patient's condition as the proposed

11

treatment." *Strodtman*, 293 P.3d at 133 (quoting *Medina*, 705 P.2d at 974).

¶ 27     Dr. Chamberlain requested authorization to administer involuntarily five antipsychotic medications, two antianxiety medications, and two side effect medications. He testified that an antipsychotic medication was necessary to "treat the specific ways in which [S.D. had] lost touch with reality," to decrease the prominence of her delusions, and to avoid more severe episodes in the future.

¶ 28     In discussing the five requested antipsychotic medications, Dr. Chamberlain testified that he "would start" with aripiprazole "because it has [a] lower risk of medical . . . side effects," about which S.D. is particularly worried. He explained that aripiprazole can be administered orally or as a long-acting injectable. However, because he did not want to administer a long-acting injectable until he confirmed that S.D. could tolerate the medication, he also requested approval to administer haloperidol, a short-acting injectable that would only be administered if S.D. refused to take aripiprazole orally.

¶ 29     In light of the evidence establishing the efficacy of aripiprazole to treat S.D.'s mental illness, we conclude there is sufficient evidence to support the magistrate's findings that there is no less intrusive alternative treatment than the administration of aripiprazole.  Further, because aripiprazole and haloperidol are substitutes for each other in that they are administered differently — and because S.D. would need haloperidol if she refused to take aripiprazole — the record supports the magistrate's finding that there is no less intrusive alternative to authorizing the involuntary administration of haloperidol and aripiprazole.

¶ 30     Further, Dr. Chamberlain testified that he requested two side effect medications, benztropine and diphenhydramine, to treat any side effects S.D. might experience from the antipsychotic medications.  However, Dr. Chamberlain did not explain which medication would be appropriate to treat the potential side effects resulting from administration of haloperidol or aripiprazole specifically.  Therefore, we affirm the order authorizing the administration of benztropine and diphenhydramine, but only to the extent that (1) S.D. develops side effects from aripiprazole or haloperidol and (2) S.D.'s treating physicians believe that

13

benztropine or diphenhydramine (or both) would be appropriate to treat those side effects.

¶ 31    We reach different conclusions as to the remaining requested medications — fluphenazine, olanzapine, paliperidone, diazepam, and lorazepam.

¶ 32    Dr. Chamberlain testified that, while olanzapine is "[t]he most effective [antipsychotic] med[ication] on [the] list," he would "not start with [it] because of [S.D.'s] metabolic concerns" regarding her possible prediabetic condition.  Significantly, Dr. Chamberlain did not provide substantive testimony regarding fluphenazine (which appears in the hearing transcript as "phenazine") or paliperidone. He referred to phenazine only once, in his listing of the medications for which he was requesting authorization to administer to S.D. involuntarily.  Dr. Chamberlain similarly said next to nothing about paliperidone.

¶ 33    In addition, he explained that diazepam and lorazepam, the two requested antianxiety medications, "lower the volume of agitation and irritability" and, while S.D. "has not been an imminent threat to herself or others[,] . . . . when people are compelled to take medications, oftentimes their behavior

deteriorates in the short term before it improves, so these medications are to treat that." But the People did not present any evidence regarding the likelihood that S.D. would experience agitation or irritability if and when compelled to take haloperidol and aripiprazole or that S.D. had ever needed antianxiety medications.

¶ 34     While it may seem prudent to have a court-approved plan in place if certain medications do not have their desired effect, or to protect against unanticipated reactions the patient may experience, divisions of this court have consistently held that *Medina* does not allow courts to authorize a backup plan for the involuntary administration of additional medications in the absence of a specific articulable concern that the approved medications will be ineffective. *See People in Interest of R.C.*, ¶¶ 14, 16, 451 P.3d at 1232 (finding that ordering the administration of one medication, which would have the desired effect, was a "less intrusive alternative" than ordering the possible administration of six medications, given the doctor's testimony that the patient did not need all six at the time of the hearing, and may not need them in the future); *cf. People in Interest of R.K.L.*, 2016 COA 84, ¶ 44, 412

P.3d 827, 837 (holding that "mere speculation that [the patient] might need these medications in the future . . . . did not prove that [the patient's] prognosis without treatment by . . . ten antipsychotic medications" was sufficiently problematic to satisfy the fourth *Medina* factor).

¶ 35    Based on the record before us, it appears that Dr. Chamberlain failed to articulate such a concern for S.D.  For this reason, we conclude that the magistrate erred by finding that the People established by clear and convincing evidence that no less intrusive treatment alternative exists for the involuntary administration of olanzapine, diazepam, and lorazepam.

¶ 36    Moreover, because the People produced no evidence regarding the efficacy or possible side effects of treating S.D. with fluphenazine or paliperidone, it was not possible for the magistrate, and it is not possible for us, to "determine whether such medications meet the requirements for a finding of no less intrusive alternative." *Id.* at ¶ 40, 412 P.3d at 836.

¶ 37    Accordingly, we conclude that the record does not support the magistrate's determination regarding the involuntary administration of fluphenazine, olanzapine, paliperidone, diazepam, or lorazepam.

However, we conclude that the record supports the magistrate's finding that a less intrusive treatment alternative is not available as to the involuntary administration of aripiprazole and haloperidol. Further, the record supports part of the magistrate's finding regarding benztropine and diphenhydramine: those medications may be involuntarily administered to S.D. if she experiences side effects from aripiprazole and haloperidol that, in the opinion of her treating physicians, can be treated with benztropine or diphenhydramine (or both).

### III.   Disposition

¶ 38      The order is reversed to the extent it authorizes the involuntary administration of fluphenazine, olanzapine, paliperidone, diazepam, and lorazepam.  To the extent S.D. experiences side effects from the administration of aripiprazole or haloperidol, and if her treating physicians believe that benztropine or diphenhydramine (or both) can address those side effects, the order is affirmed as to the involuntary administration of benztropine and diphenhydramine.  The order is affirmed in all other respects.

JUDGE J. JONES and JUDGE SULLIVAN concur.