Opinion by JUDGE BERGER
¶ 1 Respondent, R.K.L., a/k/a A.J.J. (A.J.J.), appeals the probate court's orders upholding his certification and extended certification for short-term mental health treatment at Colorado Mental Health Institute at Fort Logan (CMHI-FL) and authorizing the involuntary administration of medication.
¶ 2 A.J.J. contends that the evidence is insufficient to support the court's orders. We agree with A.J.J. that the evidence does not support the court's orders authorizing involuntary administration of ten of the eleven requested antipsychotic medications, and we thus reverse the parts of the orders authorizing their involuntary administration.[1] In all other respects, we reject A.J.J.'s arguments and affirm.
I. Relevant Facts and Procedural Background
¶ 3 On December 15, 2015, petitioner, the People, filed a notice in Denver Probate Court of certification of A.J.J. for short-term mental health treatment. A letter from a CMHI-FL psychiatrist submitted with the notice alleged that A.J.J. had been transferred from Colorado Mental Health Institute at Pueblo (CMHIP) to CMHI-FL on December 10, 2015, and it was his third hospitalization at CMHI-FL. The letter alleged that A.J.J. had been at CMHIP since October 20, 2014, after being found incompetent to proceed on a third degree assault charge. According to the letter, A.J.J. was initially receiving treatment on a voluntary basis, but on December 15, 2015, he was placed on a seventy-two-hour hold after refusing to take medication.
*831 ¶ 4 The notice alleged that A.J.J. had been detained for a seventy-two-hour evaluation and found to be mentally ill, and as a result of his mental illness, he was a danger to others and gravely disabled. Consequently, he was certified to CMHI-FL for short-term treatment for a period not to exceed three months.
¶ 5 On December 17, the People filed a motion to grant involuntary medication administration authority to A.J.J.'s treating psychiatrists at CMHI-FL, alleging that A.J.J. was not competent to effectively participate in treatment decisions. Involuntary medication administration authority was requested for eleven antipsychotic, five mood-stabilizer, two anxiolytic, and six side-effect medications.
¶ 6 On January 6, 2016, the probate court held a hearing on the short-term treatment certification and the motion for involuntary medication administration authority. Dr. Matt Salbenblatt, who the parties stipulated was an expert in psychiatry, testified that he had worked with A.J.J. at CMHI-FL since he was admitted. Dr. Salbenblatt testified that A.J.J. had schizophrenia with possible bipolar disorder. He testified that A.J.J. had grandiose delusions, thought disorganization, lack of impulse control, an inability to assess reality, and poor judgment. Dr. Salbenblatt then described the medications requested, and he opined that A.J.J. met the criteria for short-term treatment certification and involuntary medication administration.
¶ 7 A.J.J. also testified at the January 6 hearing. He identified himself as "[A.J.J.], Jr., Chief, Native Indian Prince," and said he did not go by the name R.K.L. or know where that name came from. He testified that he had worked at the House of Representatives, was an attorney, worked under a judge in Minnesota "as Native Indian Prince," and had written two books for the Internal Revenue Service and the joint budget economic committee. A.J.J. testified that he did not think he suffered from a mental illness and did not want to stay at CMHI-FL but was not sure where he would live if he left. He also testified that "as a rule for [his] body, [he did] not want to take the drugs[.]" Much of his testimony was convoluted, difficult or impossible to logically follow, and not responsive to the questions asked.
¶ 8 At the conclusion of the hearing, the probate court upheld the certification for short-term treatment and granted the motion for involuntary administration authority for the requested medications (January 6 Order).
¶ 9 Before the expiration of the January 6 Order on March 15, 2016, the People filed with the probate court a notice extending the certification of A.J.J. for short-term treatment for an additional three months, to expire no later than June 15, 2016. The People also filed an amended motion seeking a three-month extension of the involuntary medication administration authority order.
¶ 10 On February 10, 2016, the probate court held a hearing on the extended short-term treatment certification and amended motion for involuntary medication administration authority. Dr. Marla Christine Barnes, who the parties stipulated was an expert in psychiatry, testified that she had been supervising A.J.J.'s care since the beginning of January 2016. She provided similar testimony as that of Dr. Salbenblatt regarding A.J.J.'s diagnosis and symptoms and the requested medications, except that she testified that she no longer sought authority to administer the mood-stabilizer medications. She also opined that A.J.J. met the criteria for extended short-term treatment certification and involuntary medication administration.
¶ 11 At the conclusion of the February 10 hearing, the probate court upheld the extended certification for short-term treatment and granted the amended motion for involuntary administration authority for the requested medications (February 10 Order).
¶ 12 A.J.J. now appeals both the January 6 Order and the February 10 Order.[2]
*832 II. Standard of Review
¶ 13 We must determine whether the evidence, when viewed as a whole and in the light most favorable to the People, is sufficient to support the probate court's order. Fifth Third Bank v. Jones, 168 P.3d 1, 2 (Colo.App.2007). We review de novo the probate court's conclusions of law and defer to the court's findings of fact if sufficient evidence in the record supports them. See People in Interest of Strodtman, 293 P.3d 123, 131 (Colo.App.2011).
III. Certification for Short-Term Treatment
¶ 14 Under the statutory scheme governing mental health care and treatment, a person who, because of an alleged mental illness, is alleged to be a danger to others or to himself or herself or to be gravely disabled may be detained for seventy-two hours for treatment and evaluation. § 27-65-106, C.R.S.2015. After the evaluation, the person may be certified for short-term treatment. § 27-65-106(7). The notice of certification must be filed with the court. § 27-65-107(2), C.R.S.2015.
¶ 15 Certification for short-term treatment (three months or less) is permitted only if "[t]he professional staff of the agency or facility providing seventy-two-hour treatment and evaluation has analyzed the person's condition and has found the person has a mental illness and, as a result of the mental illness, is a danger to others or to himself or herself or is gravely disabled," and "[t]he person has been advised of the availability of, but has not accepted, voluntary treatment." § 27-65-107(1)(a), (b). Thus, short-term treatment certification is legally unavailable unless it is shown that (1) a person is mentally ill; (2) as a result of such illness, the person is either (a) a danger to others, or (b) a danger to himself or herself, or (c) gravely disabled; and (3) the person has not accepted voluntary treatment. See id. ; see also People v. Taylor, 618 P.2d 1127, 1136 (Colo.1980).[3]
¶ 16 "If the professional person in charge of the evaluation and treatment [of someone certified for short-term treatment] believes that a period longer than three months is necessary for treatment of [that person], he or she shall file with the court an extended certification." § 27-65-108, C.R.S.2015. Extended certification for short-term treatment may be for an additional period of three months or less. See id.
¶ 17 A person subject to certification or extended certification for short-term treatment may request that the court hold a hearing to review the certification or extended certification. §§ 27-65-107(6), - 108. The court may "enter or confirm" the certification or extended certification, § 27-65-107(6), only if the court finds that the person or facility seeking certification proves by clear and convincing evidence "that the person has a mental illness and, as a result of the mental illness, is a danger to others or to himself or herself or is gravely disabled." § 27-65-111(1), C.R.S.2015.
¶ 18 A.J.J. concedes that the People established by clear and convincing evidence that he has a mental illness, and he does not challenge the probate court's finding that he has not voluntarily accepted treatment. He argues, however, that the court erred in finding that the People proved by clear and convincing evidence that he is a danger to others or gravely disabled.
A. Danger to Others
¶ 19 Neither Dr. Salbenblatt nor Dr. Barnes opined that A.J.J. was a danger to himself under the statutory definition of "danger to self," but they both opined that he was a danger to others.
"Danger to self or others" means: ... [w]ith respect to other persons, that the *833 individual poses a substantial risk of physical harm to another person or persons, as manifested by evidence of recent homicidal or other violent behavior by the person in question, or by evidence that others are placed in reasonable fear of violent behavior and serious physical harm to them, as evidenced by a recent overt act, attempt, or threat to do serious physical harm by the person in question.
§ 27-65-102(4.5)(b), C.R.S.2015.
¶ 20 In its January 6 Order, the probate court specifically found that A.J.J. was a danger to others based on his history of third degree assault. In its February 10 Order, the court found that A.J.J. was a danger to others because he had been assaultive and threatened people in the recent past, including threatening the life of a doctor on staff at CMHI-FL (although it appears from the record that this incident actually occurred at CMHIP before A.J.J. was transferred to CMHI-FL).
¶ 21 The psychiatrists' testimony at the January 6 and February 10 hearings supported these findings. Dr. Salbenblatt testified that based on A.J.J.'s history of hurting other people, difficulty controlling his behavior, and extremely impulsive interactions, A.J.J. was a danger to others, especially as his medications were wearing off and especially if he were to be in a community center or shelter where the situation would be more volatile than at CMHI-FL. Dr. Salbenblatt also testified that when A.J.J. was first hospitalized at CMHIP in December 2014, he had to be placed on emergency medications due to aggressive behaviors. Dr. Barnes agreed with Dr. Salbenblatt's assessment of A.J.J. She testified that A.J.J. had threatened to kill his doctor at CMHIP; that he had thrown a cup of hot coffee on a stranger (the basis of the third degree assault charge); that when he was not medicated, he "became very angry, threatening, and hostile" and "was not in control of himself"; and that he had directed aggression toward other patients at CMHIP and CMHI-FL in the past.
¶ 22 A.J.J. argues that because the testimony presented related to his behavior in the past, it does not establish that he was a danger to others at the time of the hearings. Rather, according to A.J.J., because both psychiatrists testified that he had been stable at CMHI-FL and Dr. Salbenblatt testified that he had not gotten into any fights at the hospital or been physically aggressive since his admission, the evidence showed that he was not presently dangerous to others.
¶ 23 A.J.J.'s argument ignores Dr. Salbenblatt's testimony that although A.J.J. had not yet acted violently at CMHI-FL during his current hospitalization, Dr. Salbenblatt believed that A.J.J.'s past history indicated that if his illness were allowed to progress further, especially if he did not stay at CMHI-FL, A.J.J. would act aggressively toward others. Dr. Salbenblatt testified that he had already seen signs that A.J.J.'s illness was progressing, such as an increase in his irritability, poor thought processing, and making threats about suing people.
¶ 24 In People in Interest of King, 795 P.2d 273, 275 (Colo.App.1990), similar facts were deemed sufficient by a division of this court to uphold a finding by clear and convincing evidence that the respondent, King, was a present danger to others because the evidence showed that King was mentally ill but had denied any mental illness and declined voluntary treatment, had a history of prior hospitalizations, and had continuing fantasies about perpetrating violence. There also was expert testimony that King had previously threatened others and that he potentially could be dangerous when not in treatment. Id.
¶ 25 The psychiatrists here similarly testified that A.J.J. had a pattern of impulsive and aggressive behavior, had multiple past hospitalizations, and had refused treatment. They both also opined that he could be threatening when not medicated. Consequently, the testimony regarding A.J.J.'s recent violent behavior (the third degree assault charge from 2014) and recent threat to kill a doctor, evaluated in light of his history of violence, constituted "a recent overt act, attempt, or threat to do serious physical harm" that "placed [others] in reasonable fear of violent behavior and serious physical harm to them." § 27-65-102(4.5)(b). We thus conclude that the evidence supported the findings that A.J.J. "pose[d] a substantial risk of physical harm to another person or persons." Id.
*834 B. Gravely Disabled
¶ 26 Alternatively, sufficient evidence supports the probate court's findings that the People had established by clear and convincing evidence that A.J.J. was gravely disabled as a result of his mental illness.
"Gravely disabled" means a condition in which a person, as a result of a mental health disorder, is incapable of making informed decisions about or providing for his or her essential needs without significant supervision and assistance from other people. As a result of being incapable of making these informed decisions, a person who is gravely disabled is at risk of substantial bodily harm, dangerous worsening of any concomitant serious physical illness, significant psychiatric deterioration, or mismanagement of his or her essential needs that could result in substantial bodily harm.
§ 27-65-102(9).
¶ 27 Both Dr. Salbenblatt and Dr. Barnes testified that A.J.J. was not capable of making informed decisions about or providing for his essential needs without significant supervision and assistance from other people. Specifically, Dr. Salbenblatt testified that because of A.J.J.'s delusions, he was not able to make a good assessment of what was a realistic way to provide for himself, and Dr. Barnes similarly explained that A.J.J.'s grandiose delusions interfered with his ability to manage his basic needs.
¶ 28 Nevertheless, A.J.J. argues that the record shows that he was able to meet his essential human needs. But the only evidence in the record that supports this statement is A.J.J.'s own testimony at the January 6 hearing that he was able to support himself when not in a mental health treatment facility (which appears inconsistent with his testimony that he did not know where he would go if released from CMHI-FL). The probate court was not required to accept A.J.J.'s testimony as credible. See People in Interest of S.G., 91 P.3d 443, 452 (Colo.App.2004).
¶ 29 Accordingly, sufficient evidence supports the probate court's orders upholding the certification and extended certification of A.J.J. for short-term treatment, and we affirm those orders.
IV. Involuntary Administration of Medication
¶ 30 To obtain the authority to involuntarily administer antipsychotic medication without violating a patient's due process rights, the government or a health care provider must prove by clear and convincing evidence all four elements set forth in People v. Medina, 705 P.2d 961, 973 (Colo.1985). Those elements are:
(1) that the patient is incompetent to effectively participate in the treatment decision; (2) that treatment by antipsychotic medication is necessary to prevent a significant and likely long-term deterioration in the patient's mental condition or to prevent the likelihood of the patient's causing serious harm to himself or others in the institution; (3) that a less intrusive treatment alternative is not available; and (4) that the patient's need for treatment by antipsychotic medication is sufficiently compelling to override any bona fide and legitimate interest of the patient in refusing treatment.
Id . The testimony of the physician seeking to administer treatment may be sufficient by itself to satisfy these criteria. See People v. Pflugbeil , 834 P.2d 843, 847 (Colo.App.1992).
¶ 31 A.J.J. argues that the evidence is insufficient to support the probate court's findings that the People established by clear and convincing evidence that treating him with antipsychotic medication met any of the four Medina elements.[4] We conclude that *835 the evidence does not support the court's findings that the People established the third and fourth Medina elements regarding involuntary administration of Abilify, Saphris, Thorazine, Clozaril, Prolixin, Haldol, Latuda, Zyprexa, Seroquel, and Risperdal. The evidence is sufficient to support the court's orders regarding involuntary administration of Invega.
A. Competency to Participate in Treatment Decision
¶ 32 To lawfully administer medication involuntarily, the petitioner first must show "the patient's incompetency to make treatment decisions." Medina, 705 P.2d at 973. "[A] court is prohibited from ordering the forced medication of an involuntarily committed ... patient unless the court is satisfied that the patient's mental illness has so impaired his judgment as to render him 'incapable of participating in decisions affecting his health.' " Id. (quoting Goedecke v. State, 198 Colo. 407, 411, 603 P.2d 123, 125 (1979) ).
¶ 33 A.J.J. emphasizes that Medina requires more than merely a showing of mental illness to allow involuntary administration of medication, and he contends that the People did not make any additional showing beyond mental illness. But in fact, both psychiatrists testified that A.J.J. was not competent to effectively participate in his treatment decisions because he did not believe he was mentally ill, and A.J.J. himself testified that he did not think that he had a mental illness. Dr. Salbenblatt further testified that A.J.J. could not realistically assess the risks and benefits of medication, and Dr. Barnes testified that she did not believe A.J.J. would take any medication on his own. The evidence thus showed more than mere mental illness; it also showed that A.J.J.'s mental illness so impaired his judgment as to render him incapable of participating in decisions affecting his health. See id.
B. Long-Term Mental Deterioration or Likelihood of Harm
¶ 34 The court "must then determine whether the proposed treatment is necessary either to prevent a significant and likely long-term deterioration in the patient's mental condition or to prevent the likelihood of the patient's causing serious harm to himself or others in the institution." Id. This determination requires the consideration of one of two alternative factors. Id. The first is the patient's actual need for the medication. Id. The alternative factor involves the physical safety of the patient and others. Id. In evaluating this factor, the court must consider "the likelihood that the patient, due to his condition, will cause serious harm to himself or others in the institution" in the absence of the proposed treatment. Id. at 974.
¶ 35 In its January 6 Order, the probate court found that the requested medications were necessary, one, to prevent a significant risk of likely long-term deterioration in A.J.J.'s mental condition, and two, in light of his history of third degree assault, to prevent the likelihood he would cause serious harm to others in the institution. The court made a similar finding in its February 10 Order but based its determination of the second factor on evidence of A.J.J.'s threatening behavior toward staff.
¶ 36 For the reasons discussed above regarding the court's findings that A.J.J. was a danger to others in the context of certification, and considering the psychiatrists' testimony that A.J.J.'s aggressive behavior improved significantly when treated with medication, the evidence is sufficient to support the court's findings that medicating A.J.J. was necessary to prevent the likelihood of him causing serious harm to others in the institution. See id. at 973.
C. No Less Intrusive Alternative
¶ 37 The third Medina element "encompasses not only the gravity of any harmful effects from the proposed treatment but also the existence, feasibility, and efficacy of alternative methods of treating the patient's condition or of alleviating the danger created by that condition." Id. at 974. A " 'less intrusive alternative' constitutes an available treatment that has less harmful side effects and is at least as effective at alleviating a patient's condition as the proposed treatment." Strodtman, 293 P.3d at 133.
¶ 38 Both psychiatrists testified that they intended to use only one antipsychotic medication, Invega, to treat A.J.J.'s schizophrenia *836 because A.J.J. had responded well to Invega in the past. However, they testified that they requested the other antipsychotic medications to allow them the flexibility to treat A.J.J. effectively in case he stopped responding to Invega or developed an intolerable allergy or side effect. Both psychiatrists opined that there were no viable, less invasive treatment alternatives available.
¶ 39 In light of the evidence establishing the efficacy of Invega to treat A.J.J.'s mental illness, we conclude that there is sufficient evidence to support the probate court's findings that there was no less intrusive alternative treatment than Invega. A.J.J. argues that a less intrusive alternative would be to allow him to remain in the mental health treatment facility without involuntarily administering medication. But a less intrusive alternative must be "at least as effective at alleviating a patient's condition as the proposed treatment," id. and the psychiatrists' testimony made clear that it was the medication that was effective in treating A.J.J.'s condition, not the confinement. Thus, not administering any medication is not a less intrusive alternative.
¶ 40 However, we agree with A.J.J. that the evidence does not support the court's findings that the People established by clear and convincing evidence that there was no less intrusive alternative than administering the ten other requested antipsychotics. The psychiatrists did not discuss the specific benefits or risks of any of the requested antipsychotics besides Invega. Since there was no evidence regarding the efficacy or the side effects of these medications, it was not possible for the probate court, and is not possible for us, to determine whether such medications meet the requirements for a finding of no less intrusive alternative. Accordingly, the court's findings that the People established by clear and convincing evidence that there was no less intrusive alternative treatment than administering these antipsychotic medications is not supported by the evidence.
D. Need for Medication Overrides Legitimate Reason to Refuse
¶ 41 The last Medina element evaluates whether the patient's compelling need for treatment with medication sufficiently overrides "any bona fide and legitimate interest of the patient in refusing treatment." Medina, 705 P.2d at 973. The court first must determine whether the patient's refusal is bona fide and legitimate and, if it is, "whether the prognosis without treatment is so unfavorable that the patient's personal preference must yield to the legitimate interests of the state in preserving the life and health of the patient ... and in protecting the safety of those in the institution." Id. at 974.
¶ 42 A.J.J. testified that although he had suffered minimal or no side effects from medications he had taken in the past, he was concerned about the possible effects of the medications on his body. The psychiatrists testified that in general, the requested medications had potential side effects, and A.J.J.'s concerns about those effects were legitimate (although Dr. Barnes testified that while all antipsychotic medications can cause problems with blood cells, the incidents with Invega are "very, very low"). However, in light of the evidence presented about the severity of A.J.J.'s illness when not treated and the risk that he would act violently towards others, we conclude that the evidence is sufficient to support the probate court's findings that his compelling need for treatment with Invega outweighed his legitimate interest in refusing treatment.
¶ 43 We reach the opposite conclusion regarding the court's findings on A.J.J.'s possible future need for the ten other requested antipsychotics. In People v. Marquardt, 2016 CO 4, ¶ 21, 364 P.3d 499, the Colorado Supreme Court held that "the abstract possibility that a patient's condition may deteriorate in the future is insufficient to support a Medina order." Therefore, a patient who was stable on his current dose of antipsychotic medication could not be involuntarily medicated with a higher dose of that medication merely on a showing that the patient's condition might improve with the higher dose. Id. at ¶ 25. The supreme court explained:
A trial court must ... weigh the risks of treatment against the risks of failing to treat the patient. If the patient is stable on the current dose, then adhering to that *837 dose will not cause additional harm. Therefore, if there is no harm in remaining at a lower dose, then this cannot outweigh the risks associated with increasing the dose.
Id . at ¶ 24 (citation omitted). Consequently, "[s]peculation that the patient might deteriorate in the future, even though he is presently stable, does not override the patient's right to bodily integrity." Id . at ¶ 21.
¶ 44 Dr. Salbenblatt and Dr. Barnes testified that they might want to treat A.J.J. with antipsychotics other than Invega if in the future Invega stopped being a viable treatment option for A.J.J. But mere speculation that A.J.J. might need these medications in the future does not show that the psychiatrists were currently unable to treat A.J.J. without the authority to administer them, especially because both psychiatrists testified that Invega currently was an effective treatment for A.J.J. Such speculation thus cannot establish that the risks of failing to treat A.J.J. with these medications outweigh the risks associated with administering them. See id. at ¶ 24. Therefore, the psychiatrists' testimony did not prove that A.J.J.'s prognosis without treatment by these ten antipsychotic medications was "so unfavorable that [his] personal preference [in refusing treatment] must yield to the legitimate interests of the state in preserving [his] life and health ... and in protecting the safety of those in the institution." Medina, 705 P.2d at 974.
¶ 45 Moreover, as discussed above, the psychiatrists never testified regarding the specific benefits and side effects of any of the antipsychotic medications requested besides Invega. To protect a patient's right to refuse treatment, the "patient's need for treatment with [antipsychotic] medication must be balanced against the intrusiveness of that treatment," and "[b]ecause different medications have different side effects, the type of [antipsychotic] medication authorized is directly related to the degree of intrusiveness of [antipsychotic]-medication treatment." In re Civil Commitment of Raboin, 704 N.W.2d 767, 771 (Minn.Ct.App.2005). Courts in other states thus have held that without testimony regarding the benefits and potential side effects of a petitioned-for medication, there is "no evidence supporting [a] ... finding that the benefits of [that] particular medication [ ] outweighed [its] harm." In re Suzette D., 388 Ill.App.3d 978, 328 Ill.Dec. 554, 904 N.E.2d 1064, 1070-71 (2009).
¶ 46 Because there was no testimony here regarding the side effects of each medication and its effectiveness in treating A.J.J., there is no evidence permitting the probate court or us to balance each medication's degree of intrusiveness against A.J.J.'s need to be treated with it. Accordingly, there is no evidence that supports the court's findings that A.J.J.'s need for treatment with these antipsychotic medications overrides his bona fide and legitimate interest in refusing treatment with them. See Medina, 705 P.2d at 974.[5]
V. Conclusion
¶ 47 The orders are reversed to the extent that they authorize involuntary administration of Abilify, Saphris, Thorazine, Clozaril, Prolixin, Haldol, Latuda, Zyprexa, Seroquel, and Risperdal.[6] In all other respects, the orders are affirmed.
JUDGE RICHMAN and JUDGE DUNN concur.

These medications are Abilify, Saphris, Thorazine, Clozaril, Prolixin, Haldol, Latuda, Zyprexa, Seroquel, and Risperdal.

Although neither party addressed this issue in their briefs, we note that the January 6 Order expired by its terms on March 15, 2016. However, "[i]n certain cases, an appeal of a short-term mental health treatment order does not become moot when the order expires if the issue on appeal is capable of repetition but evading review." People in Interest of Vivekanathan, 2013 COA 143M, ¶ 9, 338 P.3d 1017. Specifically, instances of repeated hospitalization of a psychiatric patient have been considered capable of repetition yet evading review. Gilford v. People, 2 P.3d 120, 124 (Colo.2000). A.J.J. has repeatedly been hospitalized for mental health treatment and subject to involuntary administration of medication, as addressed by prior decisions of this court in May and October 2015. Under these circumstances, we conclude that the January 6 Order is not moot. See People in Interest of King, 795 P.2d 273, 274 (Colo.App.1990).

Certification for short-term treatment also requires that "[t]he facility which will provide short-term treatment has been designated or approved ... to provide such treatment." § 27-65-107(1)(c), C.R.S.2015. The parties stipulated that this condition was met.

Regarding the mood-stabilizer medications, because the initial order authorizing their administration has expired, the February 10 Order does not include authority for their administration, and Dr. Barnes testified that she no longer believed that A.J.J. has a mood disorder, we do not address whether the People established that the Medina factors were met so as to allow their involuntary administration. We also do not address the probate court's orders regarding the involuntary administration of the anxiolytic or side-effect medications because although A.J.J. generally argues that the evidence does not support the court's orders for involuntary medication administration authority, he does not make any specific argument regarding these medications. We do not address "bald assertions of error that lack any meaningful explanation." Holley v. Huang, 284 P.3d 81, 87 (Colo.App.2011).

A.J.J. does not argue that the motions for involuntary medication administration authority and the testimony regarding those motions were deficient for failing to address the specific dose of the medications, and we thus do not decide whether this is the case.

If the People file another motion for authority to involuntarily administer these medications, this decision does not prohibit the probate court from granting the motion if it is supported by evidence that meets Medina 's requirements.