*537 Opinion by
JUDGE BERGER
¶ 1 This case requires us to decide whether the Denver Probate Court had the authority to order the involuntary administration of a drug to “chemically castrate”[1] C.J.R., a person civilly committed to a state hospital. We hold that absent legislative authority, which does not exist, the probate court has no such authority, Therefore, we reverse the portion of the probate court’s order authorizing the involuntary administration of the drug Depo-Provera.[2]
I. Pacts and Procedural History
¶ 2 C.J.R. is a long-term patient at the Colorado Mental Health Institute at Port Logan (state hospital), where he has been treated for a schizoaffective disorder, which is a form of psychosis. Manifestations of his illness include hallucinations about dead babies and. the belief that his food and his medicine are contaminated. His psychiatrist believes that C.J.R. “continues to show disorganized thinking, speech and behavior.”
¶ 3 C.J.R. has engaged in what his psychiatrist described as “sexually inappropriate behavior” for some time. He has often emerged naked from his room into the ward, where there are both men and women. He has masturbated in front of members of the hospital’s staff. But until recently, he would normally comply when a staff member told him to put on clothing. ■
¶ 4 Por many years C.J.R. was treated, with more or less success, with antipsychotic drugs. However, while taking one of those drugs, Clozaril, he suffered a grand mal seizure. The state hospital was concerned that the seizure might have been caused by Clo-zaril and thus ceased giving that drug to C.J.R.[3] The hospital continued to treat C.J.R. with other antipsychotic drugs.
■¶ 5 After cessation of the administration of Clozaril, CJ.R.’s sexually inappropriate behavior worsened. He would appear without clothing even more frequently than he had before, frightening female patients on his ward. He “repeatedly and inappropriately solicited staff members for sex.”. He -grabbed one of the nurses near her breasts, and groin area, and he repeatedly engaged in masturbatory conduct in view of other patients and staff. According to CJ.R.’s .psychiatrist, he has. become more physically aggressive, “punching, kicking [and] scratching” staff members.
¶ 6 To address these serious problems,- a psychiatrist at the state hospital prescribed the administration of the drug Depo-Prov-era. The psychiátrist testified that there was “considerable clinical evidence” that Depo-Provera “decreases libido,” and that given C.J.R.’s “hypersexual behavior,” the drug could “help him manage'some of his sexual urges.” The Depo-Provera would be administered by injection, and one injection would last ninety days.
¶ 7 CJ.R. refused to take the dfug voluntarily.
¶ 8 Depo-Provera is generally used as a contraceptive for women, but it has been used on males in' an- attempt to prevent the type of inappropriate séxual behavior C.J.R. has been engaging in. Peter J. Gimino III, Comment, Mandatory Chemical Castration for Perpetrators of Sex Offenses against Children: Following California’s Lead, 25 Pepp. L. Rev. 67, 73 (1997). When administered to males, Depo-Provera, which contains a synthetic hormone “similar to, the progesterone hormones produced' by :the body naturally,” lowers the level of testosterone, reduces the sex drive, and in most instances causes temporary impotence. People v. Gauntlett, 134 Mich.App. 737, 352 N.W.2d *538 310, 314 (1984). The use of Depo-Provera for these purposes is commonly known as chemical castration. See, e.g., People v. Collins, 110 Cal.App.4th 340, 1 Cal.Rptr.3d 641, 643 (2003).
¶ 9 The Food and Drug Administration (FDA) has approved Depo-Provera for use as a contraceptive, Colville v. Pharmacia & Upjohn Co., 666 F.Supp.2d 1314, 1317 (N.D. Fla. 2008), but the FDA has not approved its use for chemical castration, Gimino, 25 Pepp. L. Rev. at 74. However, once a drug is FDA approved, a licensed physician generally may prescribe it for any purpose. United States v. Caronia, 703 F.3d 149, 153 (2d Cir. 2012). This is referred to as an off-label use of the drug. Id.
¶ 10 CJ.R.’s psychiatrist testified that Depo-Provera can “cause feminizing effects in men,” which includes a decrease of muscle mass and the development of breasts. She also testified that a loss of bone mass (osteoporosis) may occur. In the psychiatrist’s letter to the probate court, which was attached to the People’s motion for authority to involuntarily administer Depo-Provera to C.J.R., she further stated that “[f]acial and body hair may ... decrease in thickness and growth,” and “[r]isks may also include lowered sperm count, decreased libido, erectile dysfunction and shrinking testes size.”
¶ 11 Through his court-appointed counsel, C.J.R. objected to the administration of Depo-Provera and the use of a nasogastric tube to administer other medications involuntarily. The People sought authorization from the Denver Probate Court to administer Depo-Provera involuntarily and, if necessary, to use a nasogastric tube to administer other medications, including antipsychotics. The probate court authorized the involuntary administration of Depo-Provera and use of a nasogastric tube.
¶ 12 C.J.R. now appeals that order.[4]
II. Standard of Review
¶ 13 The first question we address— whether the test established by the supreme court in People v. Medina, 705 P.2d 961, 973 (Colo. 1985), applies at all to a request to chemically castrate a person against his will — is purely a question of law that we review de novo. See People in Interest of A.M., 251 P.3d 1119, 1121 (Colo. App. 2010) (stating that whether the trial court applied the correct legal standard is a question of law that we review de novo).
¶ 14 The second question, assuming that Medina applies, is whether the People satisfied all four of its factors. In answering this question, we must determine whether the evidence, when viewed as a whole and in the light most favorable to the People, is sufficient to support the probate court’s order. Fifth Third Bank v. Jones, 168 P.3d 1, 2 (Colo. App. 2007). We review de novo the probate court’s conclusions of law and defer to the court’s findings of fact if any evidence in the record supports them. People in Interest of Strodtman, 293 P.3d 123, 131 (Colo. App. 2011).
III. The Probate Court Did Not Have any Legal Authority to Order the Involuntary Chemical Castration of C.J.R.
¶ 15 In Medina, the Colorado Supreme Court formulated a four-factor test that the People must satisfy before a court may order a patient to be forcibly medicated. While C.J.R. does not expressly argue (and did not argue in the trial court) that Medina has no application to the involuntary administration of Depo-Provera, he does argue that Medina is inapplicable because it applies only to the *539 involuntary administration of antipsychotic drugs, and there is no evidence in this record that Depo-Provera is an antipsychotic drug.
¶ 16 But assuming that C.J.R. did not raise the issue whether the trial court erred in applying Medina, we “may in [our] discretion notice any error appearing of record.” C.A.R. 1(d). C.J.R.’s argument that the Medina factors were not met, and the People’s contrary argument that they were, rests on the assumption that Medina applies. Were we to affirm the probate court’s order without addressing the underlying validity of this critical assumption, we might well be authorizing the administration of involuntary medication that the laws of this state prohibit.
¶ 17 In Medina, 705 P.2d at 968, the supreme court emphasized that the decision to forcibly medicate a patient with antipsy-chotic drugs “directly implicates the patient’s legal interests in personal autonomy and bodily integrity.” The supreme court noted that antipsychotic medications “can cause numerous and varied side effects and carry with them the risk of serious and possibly permanent disabilities in the patient.” Id. The forced administration of antipsychotic medication thus constitutes a “significant intrusion on the patient’s bodily integrity.” Id. at 969.
¶ 18 Given that forcing C.J.R. to take Depo-Provera against his will is at least as significant an intrusion, the importance of determining whether such a disruption to his bodily integrity is legally authorized cannot be reasonably disputed.[5] Thus, under these particular circumstances, we believe that we must address the validity of the parties’ and the trial court’s assumption that Medina applies. “[W]hen a trial court fails to fully apply the correct [legal] standard ... its ruling cannot stand.” People v. J.D., 989 P.2d 762, 769 (Colo. 1999).
¶ 19 We therefore consider the threshold question raised by this appeal: whether Medina applies to a request to involuntarily administer the synthetic equivalent of progesterone as part of the treatment for a mentally ill, male patient at a state hospital for the express purpose of controlling his sexually inappropriate behavior.
¶ 20 The state’s authority to involuntarily commit mentally ill persons to the state hospital for care and treatment arises by statute. See §§ 27-65-101 to -111, C.R.S. 2015. If a person who has been involuntary committed refuses to take medication that hospital personnel want to administer, section 27-65 — lll(5)(a) provides a court with authority to order that “the medication be forcibly administered to him.” If the involuntary administration of a drug is outside of this statutory' authorization, a court exceeds its authority to order it.
¶ 21 In Medina, 705 P.2d at 967, the supreme court explained -that “Colorado’s statutory scheme relating to involuntary commitment of the mentally ill clearly contemplate[s] that such persons ... have the right under appropriate circumstances ,to legitimately refuse treatment.” However, the supreme court also discussed the General Assembly’s implicit recognition that “the right of an involuntarily committed and incompetent mental patient to refuse treatment is [not] absolute” because “[t]he state ... has a legitimate interest in effectively treating the illnesses of those placed in its charge and ... protecting patients and others from dangerous and potentially destructive conduct within the institution.” Id. at 971 (citing Ch. 188, see. 2, § 27-10-111(4.5), 2010. Colo. Sess. Laws 690, which has been relocated to section 27-65-111(5)(a)).
¶ 22 Medina held that its four-part test accommodated both the statutorily recognized right of the patient to refuse treatment *540 and the statutory right of the state to forcibly treat a nonconsenting patient under certain circumstances. See id. at 972. A plain reading of Medina demonstrates that, the supreme court addressed only the involuntary administration of antipsychotic drugs. By its terms, however, section 27-65-lll(5)(a) is not limited to antipsychotic medications; instead, it applies more broadly to “medication[s].” But even assuming that Medina applies to other types of treatments, see People in Interest of M.K.M., 765 P.2d 1075, 1076 (Colo. App. 1988) (applying Medina to a petition to administer electroconvul-sive therapy), chemical castration is very different than the administration of treatments designed to treat severe mental illnesses.[6]
¶ 23 Here, the state wants to administer medication not for the purpose of treating the mental condition that causes C.J.R. to engage in sexually inappropriate behavior, but rather to specifically control certain objectionable behavior by changing the hormonal balances that define male and female sexual characteristics. See Society for Endocrinology, Testosterone, https://perma.cc/TB5 QJTC2 (Testosterone “stimulates the development of male characteristics.”). While the dissent is correct that scientists do not know everything about the causes of psychosis, or even the precise effects that antipsychotic drugs have upon the brain, it remains true that the nature of the treatment in this ease is far different than the administration of antipsychotic drugs. Psychiatric medications, like antipsychotics, “work by influencing the brain chemicals regulating emotions and thought patterns.” National Alliance on Mental Illness, Mental Health Medications, https://perma.cc/E6BH-KMNG. Antipsychot-ics “reduce or eliminate the symptoms of psychosis ... by impacting the brain chemical called dopamine.” Id. Unlike chemicals produced by .the brain, testosterone is a hormone produced.in the testes and the adrenal glands (glands that sit on top of the kidneys). Society for Endocrinology, Testosterone. A drug.that affects a man’s testosterone production, such as Depo-Provera, therefore does not affect the brain in the same way as psychiatric medications, like antipsychotics do.
¶ 24 But regardless of what medical information we or the dissent can cite to support our respective points about the similarity or dissimilarity of antipsychotics and Depo-Provera, or what determinations we can make regarding whether the effects of anti-psychotics are just as bad or worse than the effects of Depo-Provera, the fact remains that these judgments are not ours, as judges, to make. In Medina, the supreme court concluded that the General Assembly had implicitly authorized the involuntary administration of antipsychotic medications if certain factors were met. While we recognize (but dp not decide) that Medina’s holding might logically be extended beyond the involuntary administration of antipsychotics to other types of psychiatric treatments, we cannot conclude from Medina’s analysis that the General Assembly has implicitly authorized the forcible administration of synthetic hormones for the purpose sought here.
¶ 251 Considering as a whole the statutory scheme addressing the care and treatment of persons with mental illnesses, we do not believe that the General Assembly’s authorization to forcibly administer medication to non-consenting patients gives the state unlimited authority to administer any treatment whatsoever as long as its administration satisfies the Medina factors, and neither the supreme court nor any division of this court has héld that it does. Indeed, such a conclusion would contradict the supreme court’s determination that a patient’s common law right to decline medical treatment is not abrogated by involuntary civil commitment alone. Goedecke v. State, Dep’t of Insts., 198 Colo. 407, 411, 603 P.2d 123, 125 (1979).
¶ 26 The General Assembly has declared that the purposes of the statutory scheme are, among other things:
*541 (a). To secure for each person who may have a mental illness such care and treatment as will be suited to the needs of the person and to insure that such' care and treatment are skillfully and humanely administered with full respect for the person’s dignity and personal integrity;
(b) To deprive a person of his or her liberty for purposes of treatment or care only when less restrictive alternatives are unavailable and only when his or her safety or the safety of others is endangered; [and]
(c) To provide the fullest possible measure of privacy, dignity, and other rights to persons undergoing care and treatment for mental illness[.]
§ 27-65-101(1). The General Assembly has directed that the provisions of the statutory scheme are to be “liberally construed” to carry out these purposes. § 27-65-101(2).
¶ 27 This statute thus “recognize[s] that mental and emotional illnesses are not crimes and that hospitalization for their treatment is not to be confused with incarceration for punishment.” Goedecke, 198 Colo, at 411, 603 P.2d at 125. Because the involuntary chemical castration of an individual poses such an affront to his “dignity and personal integrity,” § 27-65-101(l)(a), we conclude that the involuntary chemical castration, of a person under these circumstances may be authorized, if at all, only by the General Assembly (and then only if consistent with the Constitutions of the United States and the State of Colorado).
¶ 28 The General Assembly has not done so. A number of years ago the General Assembly considered, but ultimately rejected, a law that would have permitted or required chemical' castration for those convicted of certain sexual assaults on a child. H.B. 1133, 61st Gen. Assemb., 1st Reg. Sess. (Colo. 1997).[7] While by ho means dispositive, the fact that the General Assembly declined to authorize chemical castration for persons convicted of criminal offenses supports our conclusion that, without express legislative authorization, the courts of this state do not have the authority to order chemical castration. as part of the mental health treatment of a civilly committed patient. “Persons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish.” Youngberg v. Romeo, 457 U.S. 307, 321-22, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982).
¶ 29 We conclude that a court, including this court, may not arrogate to itself the authority to impose such a treatment against the will of an individual who has been involuntarily committed to a mental health treatment facility.
¶ 30 The application of the Medina test to chemical castration, moreover, has far-reaching implications; The'dissent’s analysis easily could support not only chemical castration, but physical castration as well.[8] This expansive view also conjures up "visions of involuntary lobotómies, a practice that has long since been discredited both on legal and moral grounds. See Sheldon Gelman, Looking Backward: The Twentieth Century Revolutions in Psychiatry, Lam, and Public Mental Health, 29 Ohio N.U. L. Rev. 531, 632 (2003). Broadly applying Medina’s, holding to authorize any- type of “treatment” the facility wants to impose on the patient is irreconcilable with the legislative mandate to administer care and treatment “with full respect for the [patient’s] dignity and personal integrity,” § 27-65-101(1), and “would .render the patient’s interest in bodily integrity nothing more than an illusion,” Medina, 705 P.2d at 974.
*542 IV. The People Did Not Satisfy the Medina Elements
¶ 31 Even if we were to assume that the Medina test is applicable to a state request to chemically castrate an individual against his will, we conclude that the People did not prove by clear and convincing evidence that the requirements of Medina were established here. See § 27-65-111(1) (standard of proof).
A.Competency to Participate in Treatment Decision
¶ 32 We agree with the probate court that the People satisfied the first Medina prong— that the patient is incompetent to make treatment decisions. Medina, 705 P.2d at 973. CJ.R.’s psychiatrist testified that C.J.R. does not have any insight into his condition; he has never acknowledged that he suffers from a mental illness; and instead, he believes that the psychiatrist has misdiagnosed him. Because C.J.R.’s failure to recognize that he has a mental illness interferes with his ability to effectively participate in his treatment decisions, the record easily satisfies this element of Medina. See People in Interest of R.K.L., 2016 COA 84, ¶ 33, 412 P.3d 827.
B.Long-Term Mental Deterioration or Likelihood of Harm
¶ 33 The second Medina element is also satisfied. In considering this element, the court must determine “whether the proposed treatment is necessary either to prevent a significant and likely long-term deterioration in the patient’s mental condition or to prevent the likelihood of the patient’s causing serious harm to himself or others in the institution.” Medina, 705 P.2d at 973. This determination requires the consideration of one of two alternative factors. Id. The first factor is the patient’s actual need for the medication. Id. The second factor involves the physical safety of the patient and others. Id. In evaluating the second factor, the court must consider “the likelihood that the patient, due to his condition, will cause serious harm to himself or others in the institution” in the absence of the proposed treatment. Id. at 974.
¶ 34 The psychiatrist testified that C.J.R.’s sexually inappropriate behavior had escalated since he had been taken off of Clozaril, to the point that he represented an ongoing risk of sexual assault to other patients and staff. No other antipsychotic drugs seemed to have worked to reduce this behavior. The psychiatrist recommended Depo-Provera because she thought that it could reduce C.J.R.’s libido and thus reduce the sexual assault risk that he posed. The record therefore shows that C.J.R.’s condition is such that he likely constitutes a continuing and significant threat to the safety of others in the hospital in the absence of the proposed treatment. Id. at 973-74. Medina’s second element is thus met.
C.No Less Intrusive Alternative
¶ 35 We hold, however, that the third Medina element — that there were no less intrusive treatment alternatives available, id. at 973 — does not find support in this record. The third Medina element “encompasses not only the gravity of any harmful effects from the proposed treatment but also the existence, feasibility, and efficacy of alternative methods of treating the patient’s condition or of alleviating the danger created by that condition.” Id. at 974. A “ ‘less intrusive alternative’ constitutes an available treatment that has less harmful side effects and is at least as effective at alleviating a patient’s condition as the proposed treatment.” Strodt-man, 293 P.3d at 133.
¶ 36 We acknowledge that the treatment of C.J.R. is a challenge. He has already sexually assaulted one nurse, and we assume for these purposes that chemical castration of C.J.R. would decrease his sexually inappropriate behavior. But, in our view, the hospital has failed to establish by clear and convincing evidence that this treatment is the least intrusive way to manage his condition.
¶ 37 The psychiatrist testified that moving C.J.R. to an all-male ward might result in violent interactions with the other patients and sexual encounters with female nurses. But the record did not permit the probate court, and does not permit us, to determine why moving C.J.R. to an all-male ward — and, *543 to the extent that he needs to have contact with female nurses, physically restraining him from touching those- nurses — is not a less intrusive way to alleviate the danger caused by his behavior. That course of action would prevent C.J.R. from frightening female patients and would accommodate C.J.R.’s objections to chemical castration.
¶ 38 Moreover, the psychiatrist testified that C.J.R. had been isolated in his own room to minimize contact with others before, but this had not “work[edj” and she believed that it was more restrictive than administering the Depo-Provera. However, without any testimony regarding why confining him to his room was not a viable solution or why it was “more restrictive,” it was not possible for the. probate court, and it is not possible for us, to evaluate the gravity of any harmful effects from that course of action, or its feasibility and efficacy.
¶ 39 In view of such sparse evidence regarding these alternatives (or any-others), the People failed to establish that no less intrusive treatment alternatives are available.
D. Need for Medication Overrides Legitimate Reason to Refuse
¶ 40 We also conclude that the last Medina element is not satisfied. Medina’s fourth element evaluates whether' the patient’s need for treatment with medication is sufficiently compelling to override “any bona fide and legitimate interest of the patient in refusing treatment.” 705 P.2d at 973. A court first must determine whether the patient’s refusal is bona fide and legitimate. If it is, the court must then determine “whether the prognosis without treatment is so unfavorable that the patient’s personal preference must yield to the legitimate interests of the state in preserving the life and health of the patient ... and in protecting the safety of those in the institution.” Id, at 974.
¶ .41 The psychiatrist’s testimony and statements regarding the serious effects of Depo-Provera, including that it can “cause feminizing effects” in men,, establishes that C.J.R.’s refusal is “bona fide and legitimate.”
¶ 42 Certainly the state has a legitimate interest in protecting the safety of the other patients and the hospital’s employees from C. J.R.’s threatening behavior (and protecting C.J.R. from other patients from whom he would face harm if he cannot control his behavior). But, on the skeletal record before us, we cannot conclude C.J.R.’s prognosis, without treatment, is so unfavorable that C.J.R.’s right to refuse the Depo-Provera is overridden by the state’s desire to use the drug to control his inappropriate sexual ber havior, particularly when the People presented minimal information about the efficacy and likely success of the treatment, its long-term side effects and risks, and any treatment alternatives.[9]
¶ 43 The probate court also justified involuntary chemical castration on the basis that without it, C.J.R. would be subject to criminal charges for sexual assault, and the court did not know whether being forcibly medicated with Depo-Provera would be worse than being prosecuted for sexual assault. We-reject this rationale. Neither the probate court nor the People cited any authority to support that rationale, and we have found none. In our view, such speculation substantially exceeds the proper function.of a court.
¶ 44 Because the third'and fourth Medina elements were not satisfied by clear and convincing evidence, the probate court’s «order authorizing the forced administration of Depo-Provera to C.J.R. cannot stand.[10]
*544 V. Conclusion
¶ 45 That part of the probate court’s order authorizing the involuntary administration of Depo-Provera is reversed. That part of the order authorizing the use of a nasogastric tube to administer other medications is-affirmed.
JUDGE ROMÁN concurs.
JUDGE BERNARD concurs in part and dissents in part,

.The term "chemical castration" has been used by a number of courts and other authorities to describe the use of the drug Depo-Provera on men to control their sexual desires and behavior. See, e.g,, People v. Collins, 110 Cal.App.4th 340, 1 Cal.Rptr.3d 641, 643 (2003). We recognize that the term may not be strictly accurate regarding its physical effects on men, but we use it here because it is the most commonly used term by courts and legislatures to describe the treatment.

. C.J.R. also challenges the portion of the probate court's order authorizing the use of a naso-gastric tube to involuntarily administer medications other than Depo-Provera. We affirm that portion of the probate court’s order.

. This proceeding does not concern the administration of antipsychotic drugs or anti-seizure medications.

. The probate court’s order authorizing the involuntary administration of Depo-Provera expires on September 25, 2016. The drug is administered by injection and lasts approximately ninety days. We assume that the drug has already been administered as the probate court’s register of actions indicates that a stay of its order was not "authorized.” The order thus may expire before another dose of Depo-Provera is administered. However, ”[i]n certain cases, an appeal of a short-term mental health treatment order does not become moot when the order expires if the issue on appeal is capable of repetition but evading review." People in Interest of Vivekanathan, 2013 COA 143M, ¶ 9, 338 P.3d 1017. Because it is reasonably likely that the hospital will seek authority to re-administer the drug, we conclude that the appeal is not moot. See, e.g., People in Interest of R.K.L., 2016 COA 84, ¶ 12 n.2, 412 P.3d 827.

. We ordered the parties to file supplemental briefs to address whether Colorado courts have the statutory authority to order involuntary administration of Depo-Provera and whether the Medina test is applicable to the involuntary administration of Depo-Provera. In his supplemental brief, CJ.R. raises, for the first time, a constitutional argument that the involuntary administration of Depo-Provera is barred by his asserted constitutional right to reproductive rights. We do not address this argument both because we have resolved this case on statutory grounds and because we do not consider constitutional arguments made for the first time in a reply or supplemental brief. Giuliani v. Jefferson Cty. Bd. of Cty. Comm'rs, 2012 COA' 190, ¶ 54, 303 P.3d 131; see also People v. Czemerynski, 786 P.2d 1100, 1107 (Colo. 1990).

. Contrary to the dissent’s characterization of this opinion, we do not hold that Medina is applicable only to the involuntary administration of antipsychotic drugs. Rather, we address only the limited question presented here: whether Medina applies to the involuntary administration of a synthetic hormone for the purpose of controlling a male patient's "inappropriate sexual behavior.”

. A small minority of states (eight) have authorized involuntary chemical castration of certain offenders convicted of sexual offenses against children. See Mark D. Kielsgard & Jack Burke, Post-Incarceration Supervision of Pedophile Offenders'. An International Comparative Study, 51 No. 1 Crim. L. Bull. art. 1 (Winter 2015). Similarly, a number of foreign nations also authorize involuntary chemical castration for. certain offenders. See id.

. The dissent asserts, in reliance upon a law review article (which relies on- another law re- ’ view article), that chemical castration, unlike physical castration, is reversible.- See Peter J. Gimino III, Comment, Mandatory Chemical Castration for Perpetrators of Sex Offenses against Children: Following California's Lead, 25 Pepp. L. Rev. 67, 75 (1997). That may or not be true, but this skeletal record does not permit this court (or the probate court) to make such a finding.

. The appellate record regarding the use, efficacy, side effects (such as physical changes to the body including the sex organs and the long-term risks of the drug causing serious diseases like cancer), dose, reversibility of the treatment, and other critical aspects of the use of Depo-Provera to decrease C.J.R.'s 'sexually inappropriate behavior is skeletal at best. Indeed, the dissent appears to rely on law review articles to determine these matters, not expert testimony by qualified physicians or pharmacologists, or even medical journals, to support some of its conclusions.

. The basis on which C.J.R. challenges the probate court’s order to administer other medications, if necessary, through a nasogastric tube is unclear. We conclude that .the probate court’s order authorizing the use of a nasogastric tube, if necessary to administer medications other than Depo-Provera, is governed by Medina and the record supports that the Medina factors were satisfied as to this request.