The summaries of the Colorado Court of Appeals published opinions constitute no part of the opinion of the division but have been prepared by the division for the convenience of the reader. The summaries may not be cited or relied upon as they are not the official language of the division. Any discrepancy between the language in the summary and in the opinion should be resolved in favor of the language in the opinion.

SUMMARY
December 26, 2024

**2024COA129**

**No. 24CA1584, *People in Interest of D.N.W.* — Health and Welfare — Care and Treatment of Persons with Mental Health Disorders — Involuntary Administration of Medication**

A division of this court considers whether a trial court can mandate the involuntary administration of a "backup" medication. The division concludes that, as a matter of first impression, a trial court may indeed have the authority to permit the involuntary administration of a backup medication, but under very limited circumstances.

COLORADO COURT OF APPEALS 2024COA129

Court of Appeals No. 24CA1584
City and County of Denver Probate Court No. 22MH229
Honorable Beth A. Tomerlin, Magistrate

The People of the State of Colorado,

Petitioner-Appellee,

In the Interest of D.N.W.,

Respondent-Appellant.

ORDER AFFIRMED

Division A
Opinion by JUDGE BERGER*
Román, C.J., and Hawthorne*, J., concur

Announced December 26, 2024

Kerry Tipper, City Attorney, Daniel B. Horwitz, Assistant City Attorney, Denver, Colorado, for Petitioner-Appellee

Richard Slosman, Boulder, Colorado, for Respondent-Appellant

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S. 2024.

¶ 1    Respondent, D.N.W., appeals the probate court's order authorizing the involuntary administration of lithium. We affirm.

## I.    Background

¶ 2    D.N.W. was diagnosed with schizoaffective disorder, bipolar type, and has a long history of psychiatric hospitalizations and short- and long-term care certifications. Relevant to this appeal, D.N.W. was certified for long-term care and treatment because she was gravely disabled. The People filed a notice of extension of long-term care and treatment and a motion seeking an order authorizing the involuntary administration of Haldol, lithium, Ativan, and Cogentin.

¶ 3    The probate court held a hearing on the motion and heard testimony from D.N.W.'s psychiatrist, Dr. Charles Koransky. He was the only witness at the hearing. Through counsel, D.N.W. waived her presence at the hearing.

¶ 4    After considering testimony from Dr. Koransky, the court granted the petition for extension of treatment and also ordered that the requested medications be administered to D.N.W. against her will.

¶ 5     D.N.W. challenges on appeal only the court's order to involuntarily administer lithium.  She does not challenge the court's extension of long-term care or the involuntary administration of Haldol, Ativan, or Cogentin.

## II.     Involuntary Administration of Medication

¶ 6     A court may authorize the involuntary administration of medications to a patient if the petitioner establishes by clear and convincing evidence the four elements set forth in *People v. Medina*, 705 P.2d 961, 973 (Colo. 1985).

¶ 7     D.N.W. does not challenge the probate court's findings on the first, second, or fourth *Medina* elements related to the administration of lithium.  She does, however, challenge the sufficiency of the evidence supporting the court's findings as to the third *Medina* element — that a less intrusive alternative is not available.  Reviewing the probate court's conclusions of law de novo, and the court's findings of fact for clear error, *People in Interest of R.K.L.*, 2016 COA 84, ¶ 13, we reject her challenge.

¶ 8     The third *Medina* element requires the petitioner to prove by clear and convincing evidence that a less intrusive treatment alternative to the requested medication is unavailable.  *Medina*, 705

P.2d at 973. "Under *Medina,* a 'less intrusive alternative' constitutes an available treatment that has less harmful side effects and is at least as effective at alleviating a patient's condition as the proposed treatment." *People in Interest of Strodtman,* 293 P.3d 123, 133 (Colo. App. 2011) (quoting *Medina,* 705 P.2d at 974). This element "encompasses not only the gravity of any harmful effects from the proposed treatment but also the existence, feasibility, and efficacy of alternative methods of treating the patient's condition or of alleviating the danger created by that condition." *Medina,* 705 P.2d at 974; *see R.K.L.,* ¶ 37.

¶ 9    D.N.W. contends that there is a less drastic alternative to lithium — the continued administration of Haldol — given that "she is responding effectively to Haldol and has not needed to be prescribed lithium in about nine months." Further, D.N.W. asserts that the lithium may have caused her serious side effects of diarrhea and incontinence. Moreover, she asserts that lithium can only be administered orally (while Haldol is an injectable), and that Haldol will treat mania as "successfully" as lithium.

¶ 10    Regarding D.N.W.'s current need for lithium, Dr. Koransky testified that D.N.W. needed lithium "if she were to become manic

and maybe didn't meet the threshold for hospitalization to hopefully get her out of the mania and to have more mood stability." He explained that, with her diagnosis, there can be and, critically, there had been "flare-ups" of mania "related to stressors or just unknown circumstances." Dr. Koransky conceded that mania "flare-ups" can be "hard to kind of predict." But if left untreated, mania would cause D.N.W. to decompensate and might require rehospitalization. He further explained that, "[w]hen people are manic, they can often engage in risky behaviors where they can do things that can be harmful financially [or to] relationships," and sometimes there is a possibility of "increased aggression," which could "put [D.N.W.] at risk for harm or violence."

¶ 11    As to D.N.W.'s concerns about the side effects of lithium, including diarrhea and incontinence, Dr. Koransky testified that D.N.W. responded well to lithium in the past. And while she "attributed the diarrhea and incontinence to the lithium," she had since stopped taking lithium, and "there's been no change" in these symptoms "with or without the lithium."

¶ 12    Crediting this testimony, the probate court found that "lithium [was] currently needed" to "treat mania and [D.N.W.] ha[d]

4

responded well to the lithium in the past when she ha[d] become manic." The court also found that, "although [D.N.W.] is not currently taking [lithium]," her "doctor need[ed] to have [lithium] available to be able to treat her mania" because "it is hard to predict when mania could occur and there is a risk of letting her mania go untreated." Moreover, the court found that, because D.N.W. "ha[d] experienced mania in the past" and because of "the risks of having mania go untreated," there was "a current need" for lithium.

¶ 13    Viewing Dr. Koransky's testimony in the light most favorable to the People, we conclude the record supports the court's findings. *See R.K.L.*, ¶ 13; *see also People v. Pflugbeil*, 834 P.2d 843, 847 (Colo. App. 1992).

¶ 14    A division of this court has addressed circumstances in which a "backup" medication is inappropriate. But no Colorado published opinion has addressed the converse — whether and, if so, under what circumstances a court may order the involuntary administration of a "backup" medication.

¶ 15    In *People in Interest of R.C.*, 2019 COA 99M, ¶ 16, a division of this court reversed an order for involuntary administration of a backup medication. The division concluded that the People did not

5

satisfy the third *Medina* element as to the backup medications because administering the primary medication, which would have produced the desired effect, was a less intrusive treatment alternative. Importantly, the treating physician testified that R.C. did not need the backup medications at the time of the hearing and "did not state *unconditionally*" that the patient would need to take them in the future. *Id.* at ¶ 11 (emphasis added).

¶ 16 The *R.C.* division found support for its conclusion in *R.K.L.*, in which a division of this court concluded that "mere speculation" that a patient "might need [the requested] medications in the future" was insufficient to satisfy the fourth *Medina* element. *R.K.L.*, ¶ 44; *R.C.*, ¶¶ 13-14. And while the division in *R.C.* recognized that *R.K.L.* reached its conclusion in the context of the fourth *Medina* element, it nevertheless agreed that the possibility that a medication may no longer be an effective treatment "at some unspecified time in the future" was insufficient to justify the entry of an order authorizing the administration of additional medications. *R.C.*, ¶ 14.

¶ 17 But, as noted, neither *R.K.L.* nor *R.C.* addressed whether there are *any* circumstances that justify an order for the involuntary

6

administration of a backup medication. Given the purposes of an order for involuntary administration, as addressed in *Medina,* we think the treating psychiatrist or institution must be given some flexibility, under prescribed circumstances, to involuntarily administer a backup medication. Otherwise, the purpose underlying *Medina*'s holding would be frustrated. As stated in *Medina,* "[t]he state clearly has a legitimate interest in effectively treating the illnesses of those placed in its charge and, as well, in protecting patients and others from dangerous and potentially destructive conduct within the institution." 705 P.2d at 971.

¶ 18   Considering the legitimate interests of the state, as well as the patient's right to "bodily integrity," we hold that, under the facts of this case, the court did not err by authorizing the involuntary administration of a backup medication. *Id.* at 973. A court has the authority to authorize the administration of a backup medication only when the petitioner presents clear and convincing evidence, and the court finds a specific articulable concern, that the involuntary administration of the primary medication will be ineffective, if the patient experiences a recurrence of a condition or

symptoms that previously required administration of the backup medication.

¶ 19    We conclude that the People met this burden in this case. Dr. Koransky's testimony provided a specific and articulable concern sufficient to justify the involuntary administration of lithium. Dr. Koransky testified unequivocally that D.N.W. has a history of experiencing mania and, in the not so distant past, required treatment with lithium to treat these "flare-ups." Dr. Koransky also testified that, despite taking Haldol consistently, he expected that D.N.W. would continue to experience mania "flare-ups" in the future. Based on his testimony, Dr. Koransky was not seeking the sort of court-approved backup plan the physician in *R.C.* sought should Haldol prove inefficacious. Rather, Dr. Koransky sought authorization to administer lithium based on a known and potentially recurring situation particular to D.N.W. based on her mental health history. The court found Dr. Koransky's testimony "uncontroverted and credible."

¶ 20    Deferring to the court's determinations of the witness's credibility and the weight afforded to his testimony, as we must, we conclude that the record contains sufficient support for the court's

finding as to the third *Medina* element. *See id.* at 974; *see also* *R.C.*, ¶ 7.

## III. Disposition

¶ 21 The order is affirmed.

CHIEF JUDGE ROMÁN and JUDGE HAWTHORNE concur.