The summaries of the Colorado Court of Appeals published opinions constitute no part of the opinion of the division but have been prepared by the division for the convenience of the reader. The summaries may not be cited or relied upon as they are not the official language of the division. Any discrepancy between the language in the summary and in the opinion should be resolved in favor of the language in the opinion.

SUMMARY
October 9, 2025

## 2025COA82

**No. 25CA0905, *People in Interest of Ferguson* — Health and Welfare — Care and Treatment of Persons with Mental Health Disorders — Involuntary Administration of Medication**

A division of the court of appeals expands on *People in Interest of D.N.W.*, 2024 COA 129, by holding that, when authorizing the involuntary administration of medication, a court can authorize a reasonable set of options when a treating physician (1) lacks sufficient knowledge of the patient's medical history to know which medication will be most effective in treating the patient; (2) articulates a reasonable plan for the sequence in which the alternatives will be administered; and (3) demonstrates a need for flexibility in treatment options.

COLORADO COURT OF APPEALS                    **2025COA82**

---

Court of Appeals No. 25CA0905
City and County of Denver Probate Court No. 25MH313
Honorable Beth A. Tomerlin, Magistrate

---

The People of the State of Colorado,

Petitioner-Appellee,

In the Interest of Theodore Ferguson,

Respondent-Appellant.

---

ORDER AFFIRMED

Division VII
Opinion by JUDGE TOW
Lum and Moultrie, JJ., concur

Announced October 9, 2025

---

Katie McLoughlin, Acting City Attorney, Daniel Horwitz, Assistant City Attorney, Denver, Colorado, for Petitioner-Appellee

Richard Slosman, Boulder, Colorado, for Respondent-Appellant

¶ 1 Theodore Ferguson appeals the probate court's order authorizing the involuntary administration of four antipsychotic medications to treat his schizophrenia, one antianxiety medication to treat his agitation, and two medications to treat any negative side effects. This appeal requires us to clarify the conditions under which a court may include authorization of more than one medication option to treat a particular condition in an involuntary medication order. We conclude that, when a treating physician (1) lacks sufficient knowledge of the patient's medical history to know which medication will be most effective in treating the patient, (2) articulates a reasonable plan for the sequence in which the alternatives will be administered, and (3) demonstrates a need for flexibility in treatment options, the probate court may authorize the full set of options.

¶ 2 Because the record supports the probate court's findings in this regard and we discern no other basis to disturb its order, we affirm.

## I. Background

¶ 3 In January 2025, Ferguson was found incompetent to proceed in three criminal cases. While Ferguson was being held in the

1

Denver jail awaiting a bed at a competency restoration facility, he maintained a delusional belief that multiple officers at the jail were tampering with his food by putting semen, urine, or genital warts in it. He was also verbally aggressive with officers and tried to hit them with bodily fluids.

¶ 4    Ferguson's treating psychiatrist at the jail was Dr. James Haug, a psychiatrist at Denver Health Medical Center, which provides medical and psychiatric care to detainees at the jail. Ferguson was also verbally aggressive with Dr. Haug and tried to hit him with bodily fluids. Dr. Haug diagnosed Ferguson with an unspecified schizophrenia spectrum disorder. That diagnosis was based, at least in part, on Ferguson's delusional belief that his food was being tampered with, along with evidence that, during prior outpatient treatment at Denver Health, he was responding to internal stimuli and having conversations with people who were not there.

¶ 5    Because Ferguson has consistently refused to take any antipsychotic medication, Denver Health filed a petition in April 2025 to involuntarily medicate him pursuant to section 16-8.5-112,

C.R.S. 2025. Dr. Haug requested authorization to treat Ferguson with

- four antipsychotic medications: Zyprexa (olanzapine), Risperdal (risperidone), Haldol (haloperidol), and Invega (paliperidone);

- the antianxiety medication Ativan (lorazepam); and

- two medications to treat any side effects: Benadryl (diphenhydramine) and Cogentin (benztropine).

¶ 6     After the petition was filed, Ferguson's counsel successfully moved to appoint an expert witness to conduct an independent psychiatric evaluation of Ferguson. The psychologist who conducted that independent evaluation, Dr. John Dicke, filed a report agreeing that Ferguson "needs to be involuntarily administered psychotropic drugs according to [Dr. Haug's] prescription." Dr. Dicke explained that conclusion as follows:

> So . . . severe is [Ferguson's paranoid schizophrenia] that he is obsessed with the notion there are feces, urine and semen in his food. [Ferguson] has to be isolated in the jail because of his paranoia and history of assaulting others and guards. This isolation can only lead to more severe paranoia . . . . [Ferguson's] reasons for refusing medication are largely based on paranoid delusions and

3

are not legitimate . . . . [W]ithout some sort of psychotropic intervention, [Ferguson's] prognosis is very grim indeed.

¶ 7     Dr. Haug and Ferguson both testified at the hearing on the petition. Dr. Dicke's report was admitted into evidence.

¶ 8     Dr. Haug, who testified as an expert in adult psychiatry, described Ferguson's schizophrenia as "severe," explaining that, among other things, Ferguson is unable to recognize reality and does not have insight into his mental illness. Dr. Haug testified that medication was "[a] hundred percent" essential to treat Ferguson effectively, and, as explained further below, he testified in detail about his reasoning for requesting the four antipsychotic medications, the antianxiety medication, and the two medications to treat any negative side effects. He also testified that Ferguson believed that he had only ADHD and refused to take antipsychotic medications.

¶ 9     During Ferguson's testimony, which is at times difficult to discern from the transcript, he appears to have confirmed his belief that he has ADHD, not schizophrenia, and he testified that it is not possible to have both conditions. He testified that he has taken some of the requested medications in the past. And he also

4

confirmed that he believes officers were tampering with his food by putting "semen, blood, feces, [and] genital [warts]" in it.

¶ 10    Following the testimony, the probate court found that Dr. Haug had testified credibly and that, to the extent Ferguson's testimony contradicted Dr. Haug's testimony, Ferguson's testimony was not credible.  The court then examined each of the four elements of the test from *People v. Medina*, 705 P.2d 961, 973 (Colo. 1985), for the involuntary administration of medication, concluded that the People had met their burden of proving all four elements, and granted the petition.

## II.    Applicable Law and Standard of Review

¶ 11    The parties agree that the *Medina* test applies here.  Under that test, a probate court may authorize the involuntary administration of medication if the People prove the following elements by clear and convincing evidence:

(1)    the person is incompetent to effectively participate in the treatment decision;

(2)    the treatment is necessary to prevent a significant and likely long-term deterioration in the person's mental health condition or to prevent the likelihood of the

patient's causing serious harm to himself or others at the institution;

(3)     a less intrusive treatment alternative is not available; and

(4)     the person's need for treatment is sufficiently compelling to override any bona fide and legitimate interest of the person in refusing treatment.

*Id.*

¶ 12     Application of the *Medina* test involves mixed questions of fact and law. *People v. Marquardt*, 2016 CO 4, ¶ 8. We defer to the probate court's factual findings if they have record support, but we review the court's legal conclusions de novo. *Id.* Resolving conflicts in testimony and determining the credibility of the witnesses are matters solely within the province of the probate court. *People in Interest of Ramsey*, 2023 COA 95, ¶ 23.

¶ 13     On a challenge to the sufficiency of the evidence, we review the record de novo to determine whether the evidence, when viewed as a whole and in the light most favorable to the People, is sufficient to support the probate court's order. *Id.* The testimony of the physician seeking to administer treatment may be sufficient, without more, to satisfy the *Medina* test by clear and convincing

evidence.  *See People v. Pflugbeil*, 834 P.2d 843, 847 (Colo. App. 1992).

### III.  Analysis

¶ 14     Ferguson contends that the probate court erred by authorizing the three additional antipsychotic medications (Risperdal, Haldol, and Invega) and the antianxiety medication (Ativan) as "backup" medications to Dr. Haug's preferred medication (Zyprexa).  He does not challenge the authorization of the two medications to treat potential side effects.

¶ 15     Ferguson does not present any argument challenging the probate court's ruling that the second *Medina* element was met here.  Instead, the three arguments he raises are as follows.  First, he argues that the People did not sufficiently prove the first *Medina* element — namely, that he was incompetent to effectively participate in the treatment decision.  Second, in an argument implicating the third and fourth *Medina* elements, he argues that the probate court should have authorized the involuntary administration of *only* Zyprexa, not Risperdal, Haldol, Invega, and Ativan as well.  And third, he raises an issue concerning the alleged

ineffective assistance of his counsel in the probate court proceedings.

A. Incompetent to Effectively Participate in Treatment Decision

¶ 16 The probate court found that Ferguson was incompetent to effectively participate in the treatment decision. That finding is supported by Dr. Haug's testimony, which the court credited. Specifically, Dr. Haug testified that (1) Ferguson has schizophrenia, treatment of which requires antipsychotic medication; (2) Ferguson "doesn't think he has any mental health issues" and instead believes that he has only ADHD; (3) Ferguson was not willing to take antipsychotic medication to treat his schizophrenia; and (4) Ferguson's refusal to take antipsychotic medication made Dr. Haug's discussions with Ferguson regarding such medication unproductive.

¶ 17 Ferguson argues that he was competent to effectively participate in the treatment decision because he had conversations with both Dr. Haug and Dr. Dicke about, for example, his belief that he had only ADHD and his concerns about taking the antipsychotic and antianxiety medications. His mere involvement in those

conversations, however, does not mean that Ferguson was competent to *effectively* participate in the treatment decision.

¶ 18    In light of the probate court's credibility determinations and resolution of conflicts in the evidence, there is ample support for the court's finding, and we will not disturb it. *See People in Interest of Strodtman*, 293 P.3d 123, 131-32 (Colo. App. 2011) (although the patient was able to articulate her preferences and concerns about medication side effects, the division affirmed the magistrate's finding that the patient was incompetent to effectively participate in the treatment decision because she did not believe she had schizophrenia and had not embraced her need for treatment of the condition); *People in Interest of R.K.L.*, 2016 COA 84, ¶ 33 (affirming the probate court's finding that the patient was incompetent to effectively participate in the treatment decision because the patient did not believe he had a mental illness and the psychiatrist testified that she did not believe the patient would voluntarily take any medication to treat the illness).

B.    Authorizing a Reasonable Set of Options

¶ 19    That brings us to Ferguson's contention, implicating the third and fourth *Medina* elements, that the probate court should have

authorized the involuntary administration of *only* Zyprexa, and that it therefore erred by also authorizing the involuntary administration of the three additional antipsychotic medications — Risperdal, Haldol, and Invega — and the antianxiety medication Ativan.

¶ 20    We first address and reject Ferguson's challenge to the court's authorization of Ativan.  Contrary to Ferguson's argument, Ativan was not an "alternative" to Zyprexa.  Ativan is not an antipsychotic medication, which is used to directly treat Ferguson's schizophrenia, but, rather, a sedative that Dr. Haug requested to treat Ferguson's agitation.  The probate court found that Ativan is "needed to treat Mr. Ferguson's agitation.  He has been getting very angry when people approach his cell and . . . he has been throwing bodily fluids."  Although the psychiatrist testified that he did not plan to "immediately" administer Ativan, he testified that Ferguson "has shown periods of agitation" — such as getting angry and "throwing bodily fluids" — that would "necessitate" using Ativan. We discern no error in the probate court's decision to authorize the involuntary administration of Ativan to Ferguson.  *See Marquardt,* ¶ 8; *Ramsey,* ¶ 23.

10

¶ 21    We now turn to whether the probate court erred by authorizing the involuntary administration of not only Zyprexa but also Risperdal, Haldol, and Invega.  Dr. Haug testified that he would not treat Ferguson with all four antipsychotic medications at the same time but, instead, would treat Ferguson first with Zyprexa and only try the others if Ferguson experienced Zyprexa's side effects or if Zyprexa was not effective.  If that happened, Dr. Haug testified, he would then try Risperdal, then Haldol, and then Invega. He testified as to the sequence in which he would try the different medications and explained why each choice was preferable to the others lower on the list.  He explained that it could take up to six weeks to determine if each antipsychotic medication was effectively treating Ferguson's schizophrenia.

¶ 22    Significantly, Dr. Haug testified that he had no documented history of Ferguson ever taking any of the four antipsychotic medications.  And, although Ferguson told Dr. Haug that he had taken all the medications in the past and that none of them was helpful for him, Dr. Haug testified that he did not feel that he could rely on Ferguson's assertion.  As to all four antipsychotic medications, Dr. Haug testified that he could not be certain which

medication or combination of medications would restore Ferguson to psychiatric stability.

¶ 23 Finally, Dr. Haug was asked about the viability of having to return to court for authorization to switch to a different medication. When asked if he had "any concerns" about having to return to court for authorization to move to each of the alternatives, Dr. Haug responded, "I would be concerned that . . . his condition would continue to deteriorate and continue to be very difficult to treat."

¶ 24 Ferguson argues that authorizing the use of *only* Zyprexa was a less intrusive treatment alternative to authorizing the use of all four antipsychotic medications (the third *Medina* element), and that authorizing the use of only Zyprexa would properly weigh his bona fide and legitimate interest in refusing the other three antipsychotic medications against his need for treatment (the fourth *Medina* element).

¶ 25 In support of that argument, he relies on *People in Interest of R.C.*, 2019 COA 99M, a case involving authorization to involuntarily administer backup medications. The People's answer brief and our own research reveal two additional such cases: *People in Interest of*

*R.K.L.*, 2016 COA 84, and *People in Interest of D.N.W.*, 2024 COA 129.  We address these three cases in chronological order.

¶ 26    In *R.K.L.*, the patient's psychiatrists testified that they intended to use only one antipsychotic medication, Invega, to treat the patient's schizophrenia because the patient had responded well to Invega in the past.  *R.K.L.*, ¶ 38.  However, the psychiatrists also requested authorization to treat the patient with ten other antipsychotic medications "in case he stopped responding to Invega or developed an intolerable allergy or side effect."  *Id.* at ¶¶ 38, 40.  The division reversed the probate court's order authorizing the use of the other ten antipsychotic medications.  *Id.* at ¶ 47.  The division reasoned that "mere speculation" that the patient might need the backup medications in the future did not show that the psychiatrists were currently unable to treat the patient without the authority to administer them, "*especially because* both psychiatrists testified that Invega currently was an effective treatment for [the patient]."  *Id.* at ¶ 44 (emphasis added).

¶ 27    Similarly, in *R.C.*, the People requested authorization to involuntarily treat the patient with Zyprexa and five other medications.  *R.C.*, ¶ 4.  However, the psychiatrist testified that the

patient had been taking Zyprexa for ten days before the hearing, that his condition had improved, and that the psychiatrist planned to continue treating the patient with only Zyprexa "for the time being." *Id.* at ¶ 10. The division reversed the district court's ruling authorizing the five other medications, reasoning that the psychiatrist did not testify that the patient "needed to receive the [subject] [m]edications at the time of the hearing" and "did not state unconditionally" that the patient would need to take them in the future. *Id.* at ¶ 11. The division further explained, "The possibility that Zyprexa may no longer be an effective treatment for [the patient], at some unspecified time in the future, is insufficient to justify the entry of an order authorizing the immediate administration" of the subject medications. *Id.* at ¶ 14.

¶ 28 The crucial distinction separating *R.K.L.* and *R.C.* from this case is that in *R.K.L.* and *R.C.*, a primary medication had already proved effective in treating the patient, but here, the probate court found that Dr. Haug "does not know which [of the antipsychotic medications] would return [Ferguson] to stability." That finding is supported by Dr. Haug's testimony that he had no documented history of Ferguson ever taking any of the four antipsychotic

14

medications, he "[could not] say one way or the other" whether Zyprexa would be effective in treating Ferguson, and he could not be certain which medication or combination of medications would restore Ferguson to psychiatric stability. Although the divisions' focus in *R.K.L.* and *R.C.* was that it was speculative whether any of the alternative medications would ever be necessary to treat the patients, we believe the appropriate focus under the circumstances here is that it is speculative whether Zyprexa (or any of the other three antipsychotic medications) will be effective in treating Ferguson.

¶ 29    The other significant facet of this case is that the probate court found that Dr. Haug "need[s] to have the authority to switch [Ferguson] to another medication *quickly*." (Emphasis added.) That finding is supported by Dr. Haug's testimony that if he were forced to wait, for example, twenty-one days — which was the time it took the petition for involuntary medication administration to get to hearing — to begin administering a new antipsychotic medication, he would be concerned that Ferguson's condition "would continue to deteriorate" and would "be very difficult to treat." Because of that, and because Dr. Haug had no idea which antipsychotic

medication will be effective in treating Ferguson, we discern no error in the probate court's granting Dr. Haug a reasonable degree of flexibility to discover which medication worked best.

¶ 30    That brings us to the third relevant case, *D.N.W.*  In that case, the patient was responding effectively to Haldol; on appeal, she challenged the district court's order authorizing the administration of lithium because she had not needed to be prescribed lithium over the past nine months.  *D.N.W.*, ¶ 9.  However, the probate court found that, although the patient was not currently taking lithium, the doctor needed the ability to administer lithium, which had been effective in treating the patient's previous episodes of mania.  *Id.* at ¶¶ 10-12.  The division concluded that a psychiatrist "must be given some flexibility, under prescribed circumstances, to involuntarily administer a backup medication."  *Id.* at ¶ 17.  The division in *D.N.W.* then said,

> A court has the authority to authorize the administration of a backup medication *only when* the petitioner presents clear and convincing evidence, and the court finds a specific articulable concern, that the involuntary administration of the primary medication will be ineffective, if the patient experiences a recurrence of a condition or

> symptoms that previously required
> administration of the backup medication.

*Id.* at ¶ 18 (emphasis added).

¶ 31    To the extent the division in *D.N.W.* intended to create a rule that a backup medication may be ordered "only when" the circumstances at issue in *D.N.W.* are present, we disagree and decline to follow *D.N.W.* *See People v. Johnson*, 2020 COA 124, ¶ 12 (one division of the court of appeals is not obligated to follow another division's precedent), *aff'd*, 2021 CO 79. The division in *D.N.W.* — which was limited to evaluating the particular circumstances in that case — could not purport to foresee *all* other possible scenarios that would warrant authorizing one or more backup medications.

¶ 32    Here, Dr. Haug lacked sufficient knowledge of Ferguson's medical history to know which medication would best address the circumstances requiring involuntary medication. He thus developed a reasonable plan for the sequence in which he would try a reasonable number of alternatives. And he identified a need for flexibility in treatment options without having to return to court each time he sought to try a new medication. We conclude that,

under these circumstances, the probate court did not err by including all four antipsychotic medication options in its order.

### C.    Alleged Ineffective Assistance of Counsel

¶ 33    Three days after the evidentiary hearing, and one day before the probate court issued its order, Ferguson filed a pro se "objection" and "demand for rehearing" in which he raised an ineffective assistance claim against the attorney who represented him at the evidentiary hearing.  The claim read as follows: "[Counsel] presented no witnesses, especially from Children's Hospital (Denver); Denver Health, namely Dr. Hurlbut; Boulder Community Hospital; [and] Bounder County Mental Health.  That due to this fact, Respondent experienced ineffective assistance of counsel."

¶ 34    In response to the ineffective assistance claim, Ferguson's counsel moved to withdraw from the case, and the probate court appointed new counsel for Ferguson to represent him on appeal. The court did not grant Ferguson a new evidentiary hearing on the petition to involuntarily medicate him.

¶ 35    In the opening brief, Ferguson's appellate counsel has brought to our attention the pro se ineffective assistance claim Ferguson

18

raised in the probate court. However, appellate counsel represents that he "is not able to develop an argument that trial counsel's performance was outside of what would be considered professionally competent assistance" because "Respondent's trial counsel argued the points Respondent raised, involved an independent expert, assured that Respondent was available for the hearing requesting a continuance for him to do so, and had Respondent testify." Appellate counsel also represents that he "is not able to develop an argument that . . . there is a reasonable probability that the outcome would have been different" had trial counsel called these witnesses because it "is not clear how witnesses from previous hospitalizations, as Respondent alleges, might have been . . . used effectively in support of Respondent's position."

¶ 36    In *People in Interest of Uwayezuk*, 2023 COA 69, ¶¶ 16-20, a division of this court held that the right to effective assistance of counsel applies to involuntary medication proceedings under section 16-8.5-112. The division in *Uwayezuk* held that the same standards governing an ineffective assistance claim in a criminal proceeding or a dependency and neglect proceeding also generally

apply in an involuntary medication proceeding. *See Uwayezuk,* ¶¶ 21-31.

¶ 37 So a respondent raising a claim of ineffective assistance in an involuntary medication proceeding must show that (1) counsel's performance was deficient and (2) the respondent was prejudiced by counsel's errors. *See id.* at ¶ 22 (citing *Strickland v. Washington,* 466 U.S. 668, 687 (1984)). But an appellate court will remand the case for further factual findings only when the respondent's allegations "are sufficiently specific to constitute a prima facie showing of ineffective assistance of counsel." *Id.* at ¶ 28 (quoting *A.R. v. D.R.,* 2020 CO 10, ¶ 63). If the respondent's "allegations lack sufficient specificity, then the ineffective assistance of counsel claim may be summarily denied." *Id.* (quoting *A.R.,* ¶ 63).

¶ 38 Ferguson's allegations in his pro se ineffective assistance claim were insufficient because he did not identify what the substance of the witnesses' testimony would have been or how calling those witnesses would have changed the result in the involuntary medication proceeding. *See People in Interest of E.D.,* 2025 COA 11, ¶ 71; *People v. Chambers,* 900 P.2d 1249, 1252 (Colo. App. 1994). We thus decline to remand the matter for an evidentiary hearing

and discern no basis to conclude that Ferguson's trial counsel was ineffective.

## IV. Disposition

¶ 39 The order is affirmed.

JUDGE LUM and JUDGE MOULTRIE concur.